516 So.2d 349 (1987)
STATE of Louisiana
v.
John THOMPSON.
No. 86-KA-2519.
Supreme Court of Louisiana.
November 30, 1987.
Rehearing Denied January 7, 1988.
*350 William J. Guste, Jr., Atty. Gen., Harry F. Connick, Dist. Atty., Eric Dubelier, Michael McMahon, Asst. Dist. Attys., for plaintiff-appellee.
Robert Couhig, Donald C. Massey, Adams & Reese, New Orleans, for defendant-appellant.
MARCUS, Justice.
John Thompson was indicted by the grand jury for the first degree murder of Raymond T. Liuzza, Jr. in violation of La.R. S. 14:30. After trial by jury, defendant was found guilty as charged. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant. The trial judge sentenced defendant to death in accordance with the recommendation of the jury. On appeal, defendant relies on eleven separate arguments[1] for reversal of his conviction and sentence.

FACTS
On the morning of December 6, 1984 at about 12:30, Kevin Freeman was driving home from his sister's house when defendant stopped him and requested a ride. Although running low on gasoline, Freeman agreed to give defendant a ride because they knew each other and lived in the same neighborhood. After driving a few blocks, the automobile began to run out of gasoline *351 and Freeman parked on the side of the street. Freeman locked the car and began walking home with defendant. Freeman asked defendant if he had any money. Defendant responded by asking if Freeman wanted to make some money and stated, "I got the heat with me." Meanwhile, Raymond T. Liuzza, Jr. was returning home and parked his automobile nearby. Defendant spotted Liuzza and informed Freeman, "I'm going to hit him." When Liuzza exited his automobile, defendant drew his .357 magnum revolver. Freeman watched defendant cross the street, grab Liuzza from behind, and throw him to the ground. As Freeman fled, he heard several shots. He looked back and saw defendant running away. Pamela Staab, a neighbor of Liuzza's, was awakened by his voice outside her bedroom window. She heard Liuzza offering his watch and wallet to his assailant. She then heard several gunshots. Staab heard nothing suggesting that Liuzza struggled or wrestled with his assailant. Paul Schliffka, another neighbor of Liuzza's, was leaving his home to meet some friends when he heard a gunshot. He began walking to the corner and heard four more shots. Schliffka then saw a man with a gun in his right hand running away. He described this man as black, about six feet tall, with short hair, wearing a black leather or plastic jacket and dark pants. This description was corroborated by Freeman who testified that defendant was wearing "a big black heavy jacket with... jeans." Officer David Carter received a call at about 12:30 that morning, dispatching him to the scene of the crime. When he arrived, the victim was lying down on his left side next to the sidewalk. Liuzza remained conscious until the ambulance arrived and repeatedly pleaded with Carter to bring him to the hospital. Liuzza told Carter that he had been robbed by a black male and repeatedly asked, "Why did he have to shoot me?" Liuzza died at 2:17 a.m. He was thirty-four years old.
The autopsy revealed that Liuzza had been shot five times, once in the right armpit, once in the right buttock, and three times in the back. All of the bullets passed completely through the victim's body, two of which were recovered from the wall of Staab's apartment. Two of the wounds to the back proved fatal. Because of the absence of discharged powder on the victim's skin or clothing, it was estimated that the muzzle of the gun was at least three to five feet away from the victim when fired. Subsequent investigation revealed that defendant, through Richard Perkins, sold the murder weapon to Junior Lee Harris. Police executed a search warrant for the gun at Harris' home and discovered Liuzza's gold pinky ring on his finger. Defendant had sold the ring to Harris for six dollars. Police also learned that Harris had sold the murder weapon to Jessie Harrison, from whom the police recovered it. The two spent bullets recovered from Staab's apartment were identified as having been fired from the murder weapon. A letter was recovered in which defendant requested the help of an unidentified person called "Big Daddy Red" in concealing his involvement in the crime. Defendant also made incriminating statements to Freeman and Perkins. Finally, Kenneth Carr testified that he overheard defendant's conversation with another at Harry's Bar in which he expressed concern over the reward offered for information leading to the arrest of Liuzza's assailant.

Argument No. 1
Defendant contends that the trial judge erred in denying his motions for a change of venue. He argues that because of extensive pretrial publicity and the potential jurors' awareness of the facts surrounding the offense, a fair trial was impossible in Orleans Parish.
Although no testimony was adduced at the hearing on defendant's motion for a change of venue, four videotapes of news reports from three local television stations were filed into evidence. Defendant later supplemented this evidence by introducing transcripts of news reports from a local radio station. Most of the submitted broadcasts were routine factual reports of the circumstances surrounding the murder: that motel executive Raymond T. Liuzza, Jr. had been shot during a robbery, that a *352 witness heard the victim plead for his life, and that the investigation was continuing. In the same fashion, the arrest of defendant and Kevin Freeman was reported. There also were broadcasts reporting how the city counsel and urban league planned to address violent crime in New Orleans. Finally, the Liuzza family's offer of a reward for information given leading to the arrest and conviction of the assailant was reported.
Before voir dire, defendant reurged his motion for a change of venue. The trial judge deferred ruling in order to observe the potential jurors' responses. After groups of potential jurors were questioned concerning their general qualifications, they were examined individually to determine the extent of each one's exposure to pretrial publicity. After several prospective jurors had been questioned, defendant reurged his motion based on their individual responses. The trial judge denied the motion, finding that those who had been exposed to pretrial publicity indicated a willingness and ability to disregard it and consider only the evidence presented at trial. Moreover, he stated that most of the veniremen recalled something about the case, but not the details. Defendant was given leave, however, to reurge the motion.
After voir dire, defendant reurged his motion. He contended that many of the jurors may have read an article appearing in The Times-Picayune, which reported defendant's recent conviction for an unrelated attempted armed robbery. This article was published on the morning that voir dire commenced. In addition, defendant contended that many of the jurors were exposed to media reports that Liuzza begged for his life before he was murdered. The trial judge again denied the motion, noting that none of the veniremen who had read the article were selected as jurors. He also found that the jurors who could recall media accounts of the murder were questioned extensively and had shown the requisite ability to base their verdict on the evidence adduced at trial.
Article 622 of the Louisiana Code of Criminal Procedure provides the grounds for a change of venue:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
The burden of proof is on the defendant to show that such prejudice exists in the collective mind of the community that a fair trial is impossible. State v. Comeaux, 514 So.2d 84 (La.1987). The defendant must show more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish. State v. Wilson, 467 So.2d 503 (La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). Whether the defendant has made the requisite showing is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. State v. Vaccaro, 411 So.2d 415 (La.1982).
In the instant case, we conclude that defendant did not meet his burden under La.Code Crim.P. art. 622. The media coverage was neither so extensive nor so inflammatory that it would entitle defendant to a change of venue. A review of the potential jurors' responses on voir dire does not reveal a prejudice existing in the public mind which could have denied defendant a fair and impartial trial. The prospective jurors were questioned individually and carefully screened for prejudicial exposure to pretrial publicity. Although most jurors had some awareness of the facts surrounding the offense, defendant is not entitled to a jury that is entirely ignorant of his case. *353 Accordingly, the trial judge did not err in denying the motions for a change of venue.

Argument No. 1 is without merit.

Argument No. 2
Defendant contends that the trial judge erred in failing to grant a mistrial based on the systematic exclusion of blacks from the jury by the state's use of peremptory challenges.
After the state exercised five of its peremptory challenges against blacks, defendant moved for an evidentiary hearing in order to determine the state's reasons for excusing them. The trial judge denied the motion and noted for the record that of the eleven jurors selected, four were black and seven were white. Defendant then moved for a mistrial based on the systematic exclusion of blacks from the jury by the state's use of peremptory challenges. Finding that defendant had not made a "particularized showing" that the assistant district attorney had a history of excluding blacks, the trial judge denied the motion and did not require the state to articulate reasons for its use of peremptory challenges. This ruling was consistent with then-existing law. See Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Voir dire continued and the state exercised its remaining three peremptory challenges against blacks. Defendant reurged his motion for a mistrial. The state offered to file written reasons for excluding each of the eight potential jurors, and the trial judge deferred ruling. After the sentencing phase, the state read into the record its reasons for exercising each peremptory challenge.
The United States Supreme Court recently reexamined the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the state's exercise of peremptory challenges against members of his race. Formerly, the Swain standard placed the burden on the defendant to prove that the state had systematically excluded blacks from juries over a period of time. State v. Williams, 445 So.2d 1171 (La.1984). The Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) rejected this standard as a "crippling burden" and held that a defendant could establish a prima facie case of purposeful discrimination on evidence adduced solely from the state's exercise of peremptory challenges at his trial. This holding is retroactive and is to be applied to all cases pending on direct review or not yet final. Griffith v. Kentucky, ___ U.S. ___, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Although the trial judge properly disposed of this issue under Swain, our determination is controlled by Batson.[2]
To establish a prima facie case under Batson, the defendant must show that he is a member of a cognizable racial group and that the state has exercised peremptory challenges to remove members of his race from the petit jury. In addition, all relevant circumstances may be considered to determine whether the defendant has made the requisite showing. In this regard, the Court stated:
For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.
Batson, 106 S.Ct. at 1723. Once the defendant makes this showing, the burden shifts to the state "to come forward with a neutral explanation for challenging black jurors." Batson, 106 S.Ct. at 1723. A prosecutor may not rebut the defendant's *354 prima facie case by merely stating that a potential juror would be partial to the defendant because of their shared race. The Court, however, "emphasize[d] that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." Batson, 106 S.Ct. at 1723. Finally, the ultimate burden of persuasion is on the defendant.
In the instant case, we conclude that the state did not exercise its peremptory challenges with a discriminatory purpose. Defendant is black and the state exercised each of its peremptory challenges against blacks. Nonetheless, four of the twelve jurors were black and each was selected before the state exhausted its peremptory challenges. Three other prospective black jurors were accepted by the state before it had exhausted its peremptory challenges, but were excused by defendant. This refutes an inference of discrimination. In addition, nothing in the prosecutor's questions or statements during voir dire supports an inference of a discriminatory purpose. After considering all relevant circumstances, we conclude that defendant failed to establish a prima facie case of purposeful discrimination.
Nonetheless, the prosecutor came forward with an explanation for challenging each black juror although he was not required to do so under then-existing law. Two of the potential jurors had prior arrests which could cause them to view the state's case unfavorably. Another was a school teacher and the mother of four children which could have rendered her sympathetic to a young defendant. Another was excluded because he and defendant were about the same age and as a result could have identified with defendant. The remainder were excluded because they were "weak" on the death penalty.
Accordingly, the trial judge did not err in denying defendant's motion for a mistrial based on the state's exercise of its peremptory challenges against blacks.

Argument No. 2 is without merit.

Argument No. 3
Defendant contends that the trial judge erred in denying his motion for a 72-hour delay under La.Code Crim.P. art. 873. He argues that the purpose of this article is to provide a "cooling off" period for the judge before imposing sentence. Because the jury in a capital case determines the sentence, defendant contends that a three-day delay should be imposed between the guilt and penalty phases to avoid an arbitrary punishment.
Defendant filed a pretrial motion for compliance with La.Code Crim.P. art. 873, and the trial judge deferred ruling. Before the sentencing hearing, defendant reurged the motion. The trial judge denied the motion as inconsistent with the Code's procedure for sentencing in capital cases.
The specific codal provisions governing sentencing in capital cases do not provide for the delay requested. See La.Code Crim.P. arts. 905, et seq. Article 873 is found in the general sentencing provisions of the Code of Criminal Procedure and provides:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
The purpose of this article is to allow defendant sufficient time to file a motion for a new trial, which must be filed between the verdict and imposition of the sentence. Official Revision Comment to Code Crim. P. art. 873.
In the instant case, defendant fails to recognize the distinction in a capital case between a jury's sentencing recommendation and the judge's imposition of a sentence based upon this recommendation. The jury returned a verdict of guilty and after a sentencing hearing recommended imposition of the death penalty on May 8, 1985. The trial judge imposed sentence on June 25, 1985. Accordingly, the trial judge did not err in denying defendant's motion for a three-day delay between the guilt and penalty phases of his trial.

*355 Argument No. 3 is without merit.

Argument No. 4
Defendant contends that the trial judge erred in failing to impose a life sentence when the jury in the sentencing phase initially was unable to unanimously agree on a recommendation. He argues that the "holdout juror" was subjected to "public deliberations" and pressure to vote in accordance with the other jurors.
After the trial judge charged the jury in accordance with La.Code Crim.P. arts. 905, et seq., the jury retired to deliberate at 6:05 p.m. Approximately two hours later, the jury informed the sheriff that they were deadlocked and court reconvened. When the court called for the sheriff to bring the jury in, the jurors told the sheriff that they wanted to continue deliberating. After deliberating for twenty minutes, the jury returned at 8:20 p.m. and the following colloquy occurred:
BY THE COURT:
Ladies and Gentlemen, have you been able to come to a decision?
BY [THE FOREMAN]:
No, Your Honor, we have not been able to come to a unanimous decision.
BY THE COURT:
Can you tell me this, without saying which way it is, do you have any idea how split the decision is?
BY [THE FOREMAN]:
Eleven to one.
BY THE COURT:
And, do you believe that any further deliberation might result in your ability to reach a decision?
BY [THE FOREMAN]:
No, Your Honor.
BY THE COURT:
I take that to mean, you do not believe that it will. Will counsels approach the bench for a second?
REPORTER's NOTE: A conference ensued at the bench.
BY THE COURT:
Ladies and Gentlemen, just so I do understand this, so that we can be very clear. It's my understanding, from what you said, that you feel that even if you were to go back out now to attempt to deliberate some more, that it would be futile, that there would not be a chance of you reaching a verdict. Would that be correct?
BY A JUROR:
We'd like to go back in.
BY THE COURT:
Ladies and Gentlemen, if you would go back in and attempt once again. If after a reasonable amount of time, it still appears that you're not able to, well then, let the sheriff know, and we will come back out. Go with the sheriff.
Defendant objected that this exchange constituted deliberation in the courtroom. He contended that the sole holdout juror, seeing "the sea of faces in the courtroom... succumbed to the pressure." Defendant requested that the jurors be returned and instructed "that each juror is entitled to his or her individual verdict." The trial judge denied the request, finding that his general charge was adequate. After an hour of additional deliberation, the jury unanimously recommended that defendant be sentenced to death.
Article 905.8 of the Louisiana Code of Criminal Procedure provides for the imposition of sentence in a capital case:
The court shall sentence the defendant in accordance with the recommendation of the jury. If the jury is unable to unanimously agree on a recommendation, the court shall impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence.
Under this article, the trial judge determines when a jury is deadlocked. His decision will not be overturned except upon a showing of palpable abuse of discretion. State v. Monroe, 397 So.2d 1258 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983); State v. Governor, 331 So.2d 443 (La.1976).
In the instant case, we find no abuse of the trial judge's discretion in allowing the jury to further deliberate. The jury had not deliberated for an unreasonable length of time and returned to deliberate on its own initiative. Nothing in the record indicates *356 that the verdict was rendered as a result of coercion by the court. The jury was twice instructed that if they could not unanimously agree on a recommendation, the court was required to impose a sentence of life imprisonment.[3] When the jury indicated an inability to unanimously determine a sentence, the trial judge did not suggest in any manner that the jury should continue deliberating. Nor is there any evidence that pressure was exerted in the courtroom on the holdout juror. The trial judge noted that the jurors appeared unanimous in their decision to deliberate further. Under these circumstances, the trial judge did not err in failing to impose a sentence of life imprisonment when the jury initially was unable to unanimously agree on a recommendation.

Argument No. 4 is without merit.

SENTENCE REVIEW
Article 1, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.Code Crim.P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La.Sup.Ct.R. 28, § 1, which provides:
Review Guidelines. Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(a) Passion, prejudice or any other arbitrary factors

There is no evidence that defendant's sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors.[4] Although defendant is black and the victim was white, nothing in the record suggests that the prosecutor made any appeal to racial prejudice in order to influence the jury in making its recommendation that the death penalty be imposed. Moreover, the jury composition was one-third black. Accordingly, we conclude that the jury's decision was not arbitrary because of racial prejudice.

(b) Statutory aggravating circumstances

The jury found that two of the aggravating circumstances listed in La. Code Crim.P. art. 905.4 were present in this case:
(1) The offender was engaged in the perpetration of ... armed robbery, ...
(7) The offense was committed in an especially heinous, atrocious, or cruel manner.
Armed robbery is the theft of anything of value from the person of another or which is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La.R.S. 14:64. The record amply supports the jury's conclusion that the murder was committed while defendant was engaged in the perpetration of an armed robbery. Kevin Freeman witnessed defendant grab Liuzza *357 from behind and throw him to the ground while armed with a .357 magnum revolver. A neighbor overheard the victim urging his assailant to take his wallet and watch before he was shot to death. The evidence showed that the assailant took these possessions as well as a gold pinky ring, which defendant sold to another for six dollars. The jury's finding that defendant committed this murder while engaged in the perpetration of an armed robbery is clearly supported by the evidence.
Because the jury's finding of one statutory aggravating circumstance is clearly supported by the record, we find it unnecessary to determine whether the jury erred in finding that the offense was committed in an especially heinous, atrocious, or cruel manner. The failure of one aggravating circumstance would not invalidate a death penalty if another aggravating circumstance is upheld on review. La.Code Crim.P. art. 905.3; State v. Carmouche, 508 So.2d 792 (La.1987); State v. Bates, 495 So.2d 1262 (La.1986), cert. denied, ___ U.S. ___, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987).

(c) Proportionality to the penalty imposed in similar cases

Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed. 2d 29 (1984). Nonetheless, Louisiana Supreme Court Rule 28, § 4 provides that the district attorney shall file with this court a list of each first degree murder case in the district in which sentence was imposed after January 1, 1976. The list shall include the docket number, caption, crime convicted, sentence actually imposed and a synopsis of the facts in the record concerning the crime and the defendant.
In the instant case, the sentence review memorandum submitted by the district attorney listed eighteen cases, including the instant one, in which juries recommended the death penalty in Orleans Parish. Our research reveals, however, that Orleans Parish juries have recommended the death penalty in twenty-three cases since January 1, 1976. Fourteen involved murders committed during the perpetration or attempted perpetration of an armed robbery.[5] In several of these cases, the victims were robbed and murdered in the street, near their homes, or in a parking lot. In the instant case, the victim was shot five times after offering his assailant his watch and wallet on the sidewalk near his home. Defendant randomly chose his victim and senselessly murdered him.
According to the Uniform Sentence Report, defendant is a black male and was twenty-two years of age when the offense was committed. He completed the tenth grade and has an IQ of 77. His employment record is sporadic. He has never been married. He has two children, one of whom he has helped to support. Defendant's criminal record begins at age fourteen and includes arrests for shoplifting, criminal trespassing, purse-snatching, and four simple burglaries. One of the simple burglary arrests resulted in conviction and one-year probation. As an adult, defendant has been arrested numerous times. He has been convicted for illegal carrying of weapons, possession of marijuana, and attempted armed robbery.
After having considered the above factors, we are unable to conclude that the sentence of death in the instant case is disproportionate to the penalty imposed in similar cases in Orleans Parish, considering both the crime and the defendant.
*358 Hence, based on the above criteria, we do not consider that defendant's sentence of death constitutes cruel, excessive, or unusual punishment.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under their prevailing rules for applying for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
LEMMON, J., concurs.
CALOGERO, J., concurs and assigns reasons.
DENNIS, J., assigns additional concurring reasons.
CALOGERO, Justice, concurring.
While I concur in the result reached by the majority opinion, I write separately regarding what I believe to be an extremely close issue presented by this case, that being the trial court's decision to allow the state to challenge a prospective juror for cause on the ground of his apparent scruples against capital punishment. The issue of whether this particular juror (Mr. Baker) should have been challenged for cause is not specifically discussed in the majority opinion,[1] although the Court did generally note in its discussion under Argument No. 5 at page ii of the appendix that "[a] review of the record reveals that the potential jurors excluded under Witherspoon-Witt stated that they could not vote in favor of the death penalty or that their views would prevent or substantially impair the performance of their duties as jurors."
Indeed Mr. Baker stated during voir dire questioning that he "might have a problem" with the imposition of the death penalty. In response to a question posed by the assistant district attorney, he stated that knowing that he might have to consider voting for the imposition of that penalty would impair his ability to be fair in the case. On the other hand, he made a number of other responses to questions posed both by the trial judge and defense counsel which indicated that he felt that he could uphold the law and impose the death penalty if circumstances so dictated, despite his scruples against capital punishment. He specifically stated that he would not automatically vote against the imposition of the death penalty, and further stated that "I believe in the judicial system and everything that goes along with it...." He added: "I might have a problem within myself with sending someone to the electric chair. That's what I'm saying."
This prospective juror seemed to waver on the issue, and a review of the transcript of the entire interrogation (see pages 111-14 of the transcript), rather than isolated responses, is necessary to a determination of the issue. On balance, and after comparing this prospective juror's answers with the standards required under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), I am not prepared to say that the trial court abused its discretion in this area by granting the state's challenge for cause against this prospective juror.
DENNIS, Justice, concurring.
I concur in affirming the conviction and the sentence but would remand the case for additional proceedings.
When the defense attorney moves for a mistrial on the ground that the state has exercised racially discriminatory peremptory challenges, the determination of whether the defense has established a prima facie case should be made at that time. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. *359 1712, 90 L.Ed.2d 69 (1986). The prosecution should not be permitted to delay the inquiry or to file untraversed reasons into the record after the fact. Accordingly, I would affirm the conviction and sentence provisionally but remand the case for a hearing first, on whether the defendant made a prima facie showing, and, if the trial court finds that such a case was made, second, on the merits of whether the peremptories were exercised pursuant to racial discrimination. In the event the challenges were made in violation of Batson and our state constitution, see La. Const. art. I, § 3; State v. Eames, 365 So.2d 1361, 1364-73 (La.1979) (concurring opinion), the conviction and sentence should be reversed; if the challenges are found proper, the temporary affirmance may be made permanent after further review by this court.
On another point, the majority states, "Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed. 2d 29 (1984). Nonetheless, Louisiana Supreme Court Rule 28, § 4 provides that the district attorney shall file with this court "a list of each first degree murder case in this district in which the sentence was imposed after January 1, 1976." This statement is correct but incomplete because it disregards our holding in State v. Brogdon, 457 So.2d 616, 631 (La.1984), that "[t]his court is required by our state constitution and its own rule in each capital sentence review to conduct a comparative proportionality review to determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Citing La. Const. art. I, § 20; La.Supreme Court Rule XXVIII; State v. Lathers, 444 So.2d 96, 97 (La.1983); State v. Sepulvado, 367 So.2d 762 (La.1979), and other authorities.

ON APPLICATION FOR REHEARING
CALOGERO and DENNIS, Justices, would grant a rehearing in this case, for the limited purpose of remanding the case to the district court for an evidentiary hearing on two distinct issues.
First, and for the reasons outlined in the partial dissenting opinion issued by Justice Dennis on original hearing, there should be a hearing on the Batson issue, specifically on whether the defendant has established a prima facie case that the state exercised its peremptory challenges in a racially discriminatory fashion. If the trial court finds that a prima facie case was made, the merits of the issue should be considered. In the event that the challenges were made in violation of Batson, the conviction and sentence should be reversed.
Also, in connection with assignment of error number 4(d)-(e), a hearing should be held to determine whether the juror Leola Chaney was subjected, in open court, to pressure or influence, to change her vote against the death penalty.
After the evidentiary hearing on these issues the trial court would be directed to decide whether the defendant is entitled to any relief. Defendant's right to appeal from the trial court rulings would be preserved.
NOTES
[1] Defendant filed an assignment of errors in the district court alleging four errors to be urged on appeal. The assigned errors do not correspond to the Specifications of Error in his brief to this court but are generally covered by the eleven arguments in his Specifications of Error. Four of the arguments will be addressed in the text of the opinion. The remaining arguments do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix that will not be published but will comprise part of the record in this case.
[2] The trial in this case was conducted on May 6-8, 1985. Batson was argued before the Supreme Court on December 12, 1985 and was decided on April 30, 1986. Accordingly, this case was tried before the Batson decision was argued and decided.
[3] In his general charge to the jury, the trial judge instructed:

If, however, you do not unanimously find beyond a reasonable doubt that any of the statutory aggravating circumstances existed, then life imprisonment without benefit of probation, parole, or suspension of sentence is the only sentence that may be imposed.
Immediately thereafter and before the jury retired for its deliberations, the trial judge instructed:
Ladies and Gentlemen, at the request of both counsels for the state and the defenseI've been requested to inform you that Article 905.8 of the Code of Criminal Procedure states that, the court shall sentence the defendant in accordance with the recommendation of the jury. That if the jury is unable to unanimously agree on a recommendation, the court shall impose the sentence of life imprisonment without benefit of probation, parole or suspension.
[4] The state introduced no evidence to show that the murder was committed in an especially heinous, atrocious, or cruel manner.
[5] State v. Parker, 372 So.2d 1037 (La.1979), cert. denied, 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983); State v. Jordan, 420 So.2d 420 (La. 1982); State v. Marshall, 414 So.2d 684 (La.), cert. denied, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982); State v. Brown, 414 So.2d 689 (La.1982); State v. Mattheson, 407 So.2d 1150 (La.1982), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); State v. James, 431 So.2d 399 (La.), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983); State v. Hamilton, 478 So.2d 123 (La. 1985), cert. denied, ___ U.S. ___, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); State v. Kyles, 513 So.2d 265 (La. 1987); State v. Brown, 514 So.2d 99 (La.1987); State v. John Thompson, No. 86-KA-2519; State v. Keith Messiah, No. 85-KA-1658; State v. John Sullivan, No. 87-KA-0027; State v. Saul Johnson, No. 309-852; State v. Tommy Cage, No. 313-962.
[1] Although defendant objected to the trial court's ruling that Mr. Baker should be excused for cause, he did not separately assign error on this issue. Nonetheless, in capital cases we will consider potential error even if it is not the subject of a specific assignment of error.