672 So.2d 933 (1996)
STATE of Louisiana
v.
Charles B. PROUT.
No. 95-KA-1845.
Court of Appeal of Louisiana, Fourth Circuit.
April 10, 1996.
Peter Barbee, Plaquemines Parish Indigent Defender Board, Pointe-a-la-Hache, for Defendant/Appellant, Charles Prout.
Richard P. Ieyoub, Attorney General, Darryl W. Bubrig, Sr., District Attorney, Pointe-a-la-Hache, and Gilbert V. Andry, III, Assistant District Attorney, New Orleans, for the State of Louisiana, Appellee.
Before BYRNES, WALTZER and LANDRIEU, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Charles Prout was charged by bill of information with two counts of distribution of cocaine, a violation of La.R.S. 40:967.[1] Prout pled not guilty. On 8 July 1993, a pre-trial hearing was held, the trial court found probable *934 cause, and denied several motions to suppress that Prout had filed. Pre-trial was set for 26 July 1993. At pre-trial, trial was set for 20 September 1993. Trial was continued on written motions of the State to 1 February 1994, 5 April 1994 and 3 May 1994. The next minute entry of record shows that on 7 June 1994, Prout failed to appear, and on motion of the State, the Court issued a bench warrant without bond, returnable instanter, and ordered Prout's bonds forfeited. On 6 September 1994, Prout moved for a continuance, to which the State objected. The minute entry states: "The Court will grant one continuance and the matter is continued to October 4, 1994." According to the minute entry for 4 October 1994: "Out of the hearing of the venire, Mr. Barbee moved for a continuance. The Court overruled the motion. Mr. Barbee also asked about his transcript request. The Court reporter is checking." Before the first witness testified, the defense again orally moved for a continuance, and the trial court explained that the court reporter who had transcribed the preliminary hearing did not work at the same firm as the court reporter who was transcribing the trial. The court did not know if the hearing had been transcribed. It ruled that if a transcribed copy could be found, the defense should be provided with a copy. The case proceed to trial and a twelve member jury found Prout guilty as charged.
The trial court sentenced Prout to twenty years at hard labor with credit for time served on count one, and $50,000 plus costs and thirty years at hard labor, the first fifteen years to be served without benefit of parole, probation or suspension of sentence on count two. The sentences were ordered to be served concurrently, provided that the first fifteen years are without benefit of probation, parole or suspension. Prout filed a motion to reconsider sentence which was denied, and filed a motion for appeal. We affirm the convictions and sentences.

STATEMENT OF FACTS
Agent Wayne Jackson of the Vernon Parish Sheriff's Department testified he was working in an undercover capacity for the Plaquemines Parish Sheriff's Office on 4 February 1993. At 9:30 p.m., he went to Avis's Bar. He pulled off the highway onto a dirt road and was approached by Prout who asked him if he "needed one." Jackson gave him $20.00, provided by the Sheriff's Office, and Prout gave him a white rock. Jackson asked him if he could come back later, and Prout said yes, and identified himself as "Charles." Jackson then met with Agent Gilbert of the Plaquemines Parish Sheriff's Office, the two drove back to the bar, and Jackson pointed Prout out to Gilbert.
On 19 February 1993, Jackson went to a basketball game at Bootheville/Venice High School and saw Prout standing near a phone booth. Prout recognized him from the previous buy. Jackson bought a rock from him for $30.00 in the parking lot in the school zone. Cathy Butler, an agent and evidence custodian for the Plaquemines Parish Sheriff's Office, testified to the chain of custody of the rocks, which the parties stipulated was cocaine, recovered by Agents Jackson and Gilbert. Paul Springer, Drug Free Schools and Communities Coordinator for Plaquemines Parish, testified that the parking lot where the buy occurred was on school grounds, that the basketball game held on 13 February 1993 involved Boothville/Venice High School, and that the date of the game fell during a regular school term.

ERRORS PATENT REVIEW
Our review of the record reveals no errors patent.
FIRST ASSIGNMENT OF ERROR: The trial court committed reversible error by denying the defendant's request for a continuance, when the promised preliminary examination transcript was not provided.
In his first assignment of error, Prout argues that the trial court erred in denying the defense motion for continuance. La. C.Cr.P. art. 707 provides:
A motion for continuance shall be in writing and shall allege specifically the grounds upon which it is based and, when made by a defendant, must be verified by his affidavit or that of his counsel. It shall be filed at least seven days prior to the commencement of trial.
Upon written motion at any time and after contradictory hearing, the court may grant *935 a continuance, but only upon a showing that such motion is in the interest of justice.
Counsel for Prout moved orally for a continuance on September 6, 1994 and again on the morning of trial. An oral motion for continuance may be reviewed on appeal where the circumstances arise unexpectedly and defense counsel has had no opportunity to prepare a written motion. State v. Parsley, 369 So.2d 1292 (La.1979). The general rule is that the denial of a continuance is not grounds for reversal absent an abuse of discretion. State v. Durio, 371 So.2d 1158 (La.1979). Even though counsel requested the transcript prior to the morning of trial, it was incumbent upon him to file a written motion for continuance, alleging his need of the transcript. State v. Roy, 496 So.2d 583 (La.App. 1st Cir.1986), writ den., 501 So.2d 228 (La.1987).
Moreover, although a defendant in a criminal prosecution has a statutory right to a transcript of the preliminary hearing in his prosecution, the failure to provide the transcript is not reversible error absent a showing that prejudice in the cross-examination and impeachment of contrary witnesses was actually sustained. Id., citing State v. Allen, 276 So.2d 868 (La.1973); State v. Benson, 368 So.2d 716 (La.1979). No such prejudice has been alleged or shown in this case.
This assignment of error is without merit.
SECOND ASSIGNMENT OF ERROR: The trial court committed reversible error by over-ruling defendant's objections to the State's use of peremptory challenges to exclude potential jurors, who were of the same minority as the defendant.
Prout argues the trial court erred in overruling defense objections to the State's use of two of its peremptory challenges to remove persons apparently of African descent from the jury panel, thereby violating Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Recently, the Louisiana Supreme Court reviewed this issue in State v. Green, 94-0887, 22-29, (La. 5/22/95) 655 So.2d 272, 287-290:
In Batson the Supreme Court adopted a three-step analysis to determine whether the constitutional rights of prospective jurors have been infringed by impermissible discriminatory practices:
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citations omitted). For a Batson challenge to succeed, it is not enough that a racially discriminatory result be evidenced; rather, that result "must ultimately be traced to a racially discriminatory purpose." Batson, supra, 476 U.S. at 94, 106 S.Ct. at 1721, quoting Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). Thus, the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes.
i. The Defendant's Prima Facie Case
The first step in this process places a burden of production or of "going forward" on the defendant. If the defendant is unable to make out a prima facie case of racial discrimination, then the Batson challenge fails and it is not necessary for the prosecutor to articulate "race-neutral" explanations for his strikes. The defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful *936 discrimination. (Citations omitted.)
* * * * * *
ii. The Prosecutor's "Race-Neutral" Explanation
Once the defendant has made out his prima facie case, the burden of production or going forward shifts to the prosecutor, who must offer a "race-neutral" explanation for his exercise of peremptory strikes. Given the nature of the Batson challenge in this case, the prosecutor was obligated to "come forward with a neutral explanation for challenging black jurors." Batson, supra, 476 U.S. at 97, 106 S.Ct. at 1723. At this stage of the Batson analysis, the sole burden which falls upon the prosecutor is to articulate reasons for his challenges that are unrelated to race or other suspect classifications; "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)....
Essentially, the burden on the prosecutor at this stage is to articulate reasons unrelated to impermissible classifications such as race for striking certain prospective jurors....

* * * * * *
iii. Did the Prosecutor Engage in Purposeful Racial Discrimination in Striking Jurors Devezin and Price?
Once the prosecutor has satisfied the second stage of the Batson procedure, "[t]he trial court ... then [has] the duty to determine if the defendant has established purposeful discrimination." Batson, supra, 476 U.S. at 98, 106 S.Ct. at 1724. In reaching a decision the trial court should examine all of the evidence available; essentially, this involves a comparison of the arguments and facts in support thereof posited in the defendant's prima facie offering with the "race-neutral" reasons articulated by the prosecutor to determine whether the prosecutor engaged in purposeful discrimination. This comparison must be made in light of the record; although reviewing courts owe the trial judge proper deference in assessing the credibility of in-court testimony, we have already stated in this opinion that simple assertions of "good faith" by the prosecutor are insufficient to counter a valid Batson challenge. See Collier [553 So.2d 815 (La.1989)], supra, 553 So.2d at 818.
... Batson, however, made it clear that the "burden" which shifts to the State after the defendant has made a prima facie showing of purposeful discrimination is a "burden of production;" it is the defendant, as "[t]he party alleging that he has been the victim of intentional discrimination, [who] carries the ultimate burden of persuasion." Batson, supra, 476 U.S. at 94 n. 18, 106 S.Ct. at 1722 n. 18. Accord, State v. Thompson, 516 So.2d 349, 354 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); re'hg denied, 488 U.S. 976, 109 S.Ct. 517, 102 L.Ed.2d 551 (1988) ("the ultimate burden of persuasion is on the defendant")....
In this case, the trial court recognized that the State had used five peremptory challenges, of four prospective jurors and one prospective alternate juror, and that three of them had been used against prospective jurors who were not apparently of African descent. The trial court implicitly found that Prout failed to establish a prima facie case of racially motivated challenges of the jurors at issue, Mr. Sylve and Ms. Jones. The trial court did not err. The record demonstrates that not only did Prout fail to prove a prima facie case of discrimination (the threshold of the Batson/Green test), but also the State had ample racially neutral reasons for having excluded the juror and alternate in question[2]. While counsel for Prout claimed a pattern of challenges of prospective jurors of apparent African descent, he did not meet his burden of persuasion under Batson/Green. The prosecutor's examination followed the pattern of a general question directed to the venire, following which additional questions were asked of individual prospective jurors who responded affirmatively to the question. There is nothing in the record to indicate that the prosecutor pursued minority jurors *937 differently than he did those who were not apparently of African descent.
Ms. Jones responded affirmatively to the trial judge's general questions asking if any member of the venire had been arrested and if any member knew any of the named witnesses, principals or attorneys. She, and others who had responded affirmatively, were then asked follow-up questions. When the prosecutor asked a general question to the venire concerning whether they would accept circumstantial evidence, Ms. Jones volunteered, "I said I am not sure about that." The trial court, in overruling defense counsel's objection to the State's having struck Ms. Jones from the panel found that she had been "very tentative in my judgment on the answers, she was very indecisive about whether she could make a decision on guilt or innocence as I recall."
Mr. Sylve, in response to the trial judge's general questioning, said he knew Prout. The judge asked:
Q: How do you know him?
A: I've been around. I am, I was a friend of him. He used to live, I believe it was, he was married to Mira, I'm not sure, I believe they were married and I used to see him in Diamond.
Mr. Sylve told the judge that he believed he could serve on the jury and that his relationship with Prout would not interfere in his decision-making. Mr. Sylve also responded to the trial judge's question concerning relatives or friends employed by the District Attorney or the Sheriff, "I have two sisters that work for the Sheriff's Office." Again, Mr. Sylve said these relationships would not enter into his decision-making process. The prosecutor did not question Mr. Sylve individually.
We find nothing in the examination to indicate racial motivation. The evident reasons for the prosecutor's questions to Ms. Jones "contain none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny." State v. Green, 655 So.2d at 289. He did not question Mr. Sylve individually. Nor is there evidence to support defense counsel's allegation that the prosecutor singled out for special questioning those jurors who appeared to be of African descent. Defense counsel contended below that the prosecutor "zeroed in on [African-appearing prospective jurors] and asked the questions again and again until the subtle process of questions he got something to work on." Our review of the record shows that the prosecutor asked the same type of follow-up questions to each of the prospective jurors who had responded affirmatively to the general questions.[3] Defense counsel's blanket *938 accusation of racial motivation is unsupported in the record. Prout having failed to make a prima facie case of racial motivation, the second assignment of error is without merit.
THIRD ASSIGNMENT OF ERROR: The trial court committed reversible error by removing a juror who had been accepted and sworn without examining the juror, and outside the defendant's presence.
Prout argues the trial court erred in dismissing a juror after he had been sworn without having allowed the defense an opportunity to question the juror.
In State v. Spencer, 446 So.2d 1197, 1199-1200 (La.1984), the Supreme Court stated:
... Code of Criminal Procedure article 831(3) provides that a defendant charged with a felony shall be present at the calling, examination, challenging, empanelling, and swearing of the jury and "at any subsequent proceedings for the discharge of the jury or a juror." Id. See State v. White, 244 La. 585, 153 So.2d 401 (1963). This rule ... does not prevent a trial court from acting summarily to dismiss a juror in an emergency unless the defendant can show that he has been prejudiced thereby.... [S]ituations may sometimes arise when a respect for the rights of jurors will require the judge to take immediate action without consulting counsel, e.g., if a juror is taken so ill that he cannot come to court.... (Citations omitted.)
In this case, the bailiff informed the trial court that the juror in question was ill, suffering with diarrhea and that he had vomited twice since having been chosen. Prout has shown no prejudice resulting from his absence when the juror was dismissed. Therefore, we find no error in the trial court's having dismissed the juror without allowing the defense an opportunity to question the juror. This assignment of error is without merit.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] The second count was amended to charge the defendant with distributing cocaine on school property in violation of La.R.S. 40:981.3.
[2] Defendant having failed to prove a prima facie case of discrimination, this becomes moot.
[3] The prosecutor's examination of Ms. Jones is illustrative. When the prosecutor's turn came to question the venire, the prosecutor asked Ms. Jones:

Q: Ms. Jones, basically the same questions like I asked Mr. Watson a moment ago, you said you were arrested, is that right?
A: Yes.
Q: And what happened there?
A: Everything was dropped.
Q: It was not the same as Mr. Watson?
A: No.
Q: What was it for?
A: Fighting.
Q: Fighting?
A: Yes.
Q: And was it dropped, do you know who dropped it?
A: It was a long time ago. I was in high school when it took place, we pressed charges against them and they pressed charges against me also.
Q: It was a fight, one side charged this side and the other side charged the other side?
A: Yes.
Q: Did each side decide to drop the charges?
A: No. Something should have been taken care of but I don't think charges should have been brought on us.
Q: Charges should not have been brought?
A: No.
Q: The people that brought the charges were people on the other side of the fight, they went to the justice of the peace?
A: Yeah.
Q: You and your friends caused the fight and y'all went to the JP and did the same thing?
A: Yeah.
Q: It was thrown out?
A: Yeah.
Q: Do you know who refused the charges?
A: No.
Q: You don't know if it was the District Attorney's Office or
A: I think it was the DA's Office, it was over here.
Q: That was it?
A: That was it.
Q: Okay. While I am speaking with you, let me ask you about a person that you knew. You know one of the persons that was read as a possible witness was Mr. Mackey, Randy Mackey. How well do you know him?
A: Not real well, he knows my brother.
Q: Okay. So as a result of that, let me ask you, I take it one side or the other says, look, you know, one shows that Mr. Mackey was not telling the truth, one side or the other said, no, I know him so well, because he is like a brother, like a close friend, like a members of your family. Look, I know him and he's telling the truth?
A: I feel that way because the fact that I know him so well.