825 So.2d 552 (2002)
STATE of Louisiana
v.
John THOMPSON.
No. 2002-K-0361.
Court of Appeal of Louisiana, Fourth Circuit.
July 17, 2002.
Harry F. Connick, District Attorney, Val M. Solino, Assistant District Attorney, New Orleans, LA, for Respondent.
Michael L. Banks, J. Gordon Cooney, Jr., Morgan, Lewis & Bockius, LLP, Philadelphia, PA, and Robert Glass, New Orleans, LA, for relator.
(Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY).
MICHAEL E. KIRBY, Judge.

STATEMENT OF THE CASE
In January, 1985, the relator was indicted for the first degree murder of Ray *553 Liuzza. On May 8, 1985, a jury found him guilty as charged and subsequently recommended the death penalty, which the trial court imposed on June 25, 1985. The Supreme Court affirmed his conviction and sentence. State v. Thompson, 516 So.2d 349 (La.1987). The U.S. Supreme Court denied certiorari. Thompson v. Louisiana, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
In 1989, the relator filed an application for post conviction relief in the trial court and supplemented his application in 1991. The trial court subsequently denied relief, and the relator sought review in the Supreme Court, filing additional claims. On September 23, 1994, the Supreme Court remanded the case for an evidentiary hearing regarding potential impeachment evidence which the relator alleged was withheld. State ex rel. Thompson v. Whitley, 92-3184 (La.9/23/94), 642 So.2d 1303. The trial court heard the matter on June 23, 1995 and denied relief on September 19, 1995. The Supreme Court subsequently denied review of the trial court's ruling. State ex rel. Thompson v. Cain, 95-2463 (La.4/25/96), 672 So.2d 906. The relator then filed a writ of habeas corpus with the United States District Court for the Eastern District of Louisiana, and that court denied relief on February 24, 1997. Thompson v. Cain, No. 96-2268, 1997 WL 79295 (E.D.La.2/24/97). On appeal from that ruling, the Fifth Circuit denied relief, Thompson v. Cain, 161 F.3d 802 (5th Cir. 1998), and the relator alleges the Supreme Court denied review on March 8, 1999.
In April, 1999, an investigator for the relator discovered additional microfilmed records in this case and in an unrelated case. Based upon these records it was discovered that the State had withheld blood identification evidence in an unrelated armed robbery case in which the relator had been convicted of attempted armed robbery just prior to the trial in this case. The evidence conclusively proved that the relator was not the perpetrator of that offense. The State had used the attempted armed robbery conviction as an aggravating circumstance to support the imposition of the death penalty in the present case. On June 29, 1999, the trial court (the same section of court where the murder was tried) granted the relator a new trial in the armed robbery case, and the State immediately nolle prosequied the armed robbery charge.
On December 22, 1999, the relator filed in the trial court an application for post conviction relief in the present case raising five claims: (1) he was denied his right to testify at trial because of the existence of the prior attempted armed robbery conviction, which had been the product of misconduct by the State; (2) he was denied his right to present a defense because he could not testify due to the existence of the attempted armed robbery conviction; (3) the State withheld exculpatory evidence; (4) his due process rights had been violated due to the egregious conduct of the State; and (5) at a minimum, his death sentence should be vacated because it was based upon his attempted armed robbery conviction, which had been set aside. The court heard the matter on October 26, 2000, and on May 26, 2001 the court denied the application as to the first degree murder conviction but vacated the death sentence and imposed a sentence of life imprisonment. The relator noted his intent to seek relief as to the denied claims, timely sought and obtained extensions of the return date, and has filed his writ timely in this court. The State has also responded.

FACTS
The following fact summary was taken from the Supreme Court's opinion in the relator's appeal:

*554 On the morning of December 6, 1984 at about 12:30, Kevin Freeman was driving home from his sister's house when defendant stopped him and requested a ride. Although running low on gasoline, Freeman agreed to give defendant a ride because they knew each other and lived in the same neighborhood. After driving a few blocks, the automobile began to run out of gasoline and Freeman parked on the side of the street. Freeman locked the car and began walking home with defendant. Freeman asked defendant if he had any money. Defendant responded by asking if Freeman wanted to make some money and stated, "I got the heat with me." Meanwhile, Raymond T. Liuzza, Jr. was returning home and parked his automobile nearby. Defendant spotted Liuzza and informed Freeman, "I'm going to hit him." When Liuzza exited his automobile, defendant drew his .357 magnum revolver. Freeman watched defendant cross the street, grab Liuzza from behind, and throw him to the ground. As Freeman fled, he heard several shots. He looked back and saw defendant running away. Pamela Staab, a neighbor of Liuzza's, was awakened by his voice outside her bedroom window. She heard Liuzza offering his watch and wallet to his assailant. She then heard several gunshots. Staab heard nothing suggesting that Liuzza struggled or wrestled with his assailant. Paul Schliffka, another neighbor of Liuzza's, was leaving his home to meet some friends when he heard a gunshot. He began walking to the corner and heard four more shots. Schliffka then saw a man with a gun in his right hand running away. He described this man as black, about six feet tall, with short hair, wearing a black leather or plastic jacket and dark pants. This description was corroborated by Freeman who testified that defendant was wearing "a big black heavy jacket with... jeans." Officer David Carter received a call at about 12:30 that morning, dispatching him to the scene of the crime. When he arrived, the victim was lying down on his left side next to the sidewalk. Liuzza remained conscious until the ambulance arrived and repeatedly pleaded with Carter to bring him to the hospital. Liuzza told Carter that he had been robbed by a black male and repeatedly asked, "Why did he have to shoot me?" Liuzza died at 2:17 a.m. He was thirty-four years old.
The autopsy revealed that Liuzza had been shot five times, once in the right armpit, once in the right buttock, and three times in the back. All of the bullets passed completely through the victim's body, two of which were recovered from the wall of Staab's apartment. Two of the wounds to the back proved fatal. Because of the absence of discharged powder on the victim's skin or clothing, it was estimated that the muzzle of the gun was at least three to five feet away from the victim when fired. Subsequent investigation revealed that defendant, through Richard Perkins, sold the murder weapon to Junior Lee Harris. Police executed a search warrant for the gun at Harris' home and discovered Liuzza's gold pinky ring on his finger. Defendant had sold the ring to Harris for six dollars. Police also learned that Harris had sold the murder weapon to Jessie Harrison, from whom the police recovered it. The two spent bullets recovered from Staab's apartment were identified as having been fired from the murder weapon. A letter was recovered in which defendant requested the help of an unidentified person called "Big Daddy Red" in concealing his involvement in the crime. Defendant also *555 made incriminating statements to Freeman and Perkins. Finally, Kenneth Carr testified that he overheard defendant's conversation with another at Harry's Bar in which he expressed concern over the reward offered for information leading to the arrest of Liuzza's assailant.
State v. Thompson, 516 So.2d at 350-351.

DISCUSSION:
Initially, it must be noted that this court has jurisdiction over this matter, and the claims raised by the relator are not barred by La.C.Cr.P. art. 930.8. Although this court had not participated in any of the earlier filings due to the imposition of the death sentence, the trial court vacated the death sentence in 2001 and imposed a life sentence. At that point, this court obtained supervisory jurisdiction over the case. With respect to art. 930.8, the defendant was convicted in 1985. However, it was not until 1999 that the relator learned of the withheld evidence which led to the attempted armed robbery, and after that conviction was vacated and the case nolle prosequied, the relator then filed the instant claims in the trial court in 1999. Thus, because the relator raised the majority of the instant claims a few months after learning of the basis for them, they are not barred by art. 930.8.[1]
The trial court vacated the death sentence in 2001 because it found the sentence was based upon the prior attempted armed robbery conviction, which it had vacated in 1999. It denied the remainder of the relator's claims. The remaining claims may be split in two groups: (1) the relator's right to testify in his own behalf and present his defense was violated; and (2) the State failed to produce police reports "and other information" which would have identified "eye- and ear-witnesses" whose testimony would have exonerated him and inculpated his codefendant, would have provided contradictory evidence to impeach his codefendant's testimony, and would have shown that the other two independent witnesses who stated they heard the relator admit to committing the murder had been promised reward money for their testimony. The relator admits the last portion of the second group has been rejected by both the Louisiana Supreme Court and the federal courts, but he insists that the cumulative effect of this and the other withheld evidence entitles him to a new trial under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
A ruling in favor of relator on the first group of claims will render the second group moot. The relator argues that he was effectively denied his right to testify in his defense because of the improper acts of the State in the armed robbery case, which led to his illegal attempted armed robbery conviction. He argues that he would have testified in his defense at the murder trial but for the attempted armed robbery conviction, which he knew the State would use to impeach his credibility. He argues that the State knew his blood type did not match the blood type of the perpetrator of the armed robbery, but it withheld this evidence to obtain his conviction in that case, to keep him from testifying during the guilt phase of the murder trial and to use as an aggravating factor to support the death penalty.
There is no doubt that the unrelated attempted armed robbery conviction was improper. The defendant's decision not to *556 testify at the murder trial was based upon the existence of this prior conviction. At the conclusion of the murder trial, defense counsel placed on the record the following statement:
... prior to the defense resting in this case, Mr. Couhig and I consulted with our client, Mr. Thompson, and discussed with him the possibility of him taking the witness stand, and testifying on his own behalf. We advised Mr. Thompson at that time, that should he take the witness stand, that the fact that he has prior convictions, including the prior conviction for attempted armed robbery would come up before the jury, which it would not if he didn't testify. Of course, that is in keeping with our previous motion in limine, requesting that that not be allowed to be used as impeachment evidence. Given the fact that were Mr. Thompson to take the stand, that would have been used against him, and after consulting with us, Mr. Thompson concurred in our decision not to take the witness stand, Your Honor.
The State does not dispute that the relator would have testified in the absence of the attempted armed robbery conviction. Indeed, the attachments to the application show that the defendant testified in his own defense at his armed robbery trial which occurred a little over a month prior to the murder trial. Thus, we conclude the relator would have testified at his murder trial but for the improper attempted armed robbery conviction.
The relator contends that the State's deprivation of his right to testify in his own behalf and to present his defense is a structural error for which a reviewing court cannot apply a harmless error standard.
In State v. Dauzart, 99-3471 (La.10/30/00), 769 So.2d 1206, the defendant originally indicated he did not want to testify. The defense rested subject to the viewing of certain documents, and while the court was viewing the documents, the defendant changed his mind and announced he wanted to testify. The court refused to allow him to do so. On appeal the circuit court found no error, but on review, the Supreme Court reversed his conviction, agreeing with the dissenting circuit court judge in his finding that under the "totality of the circumstances" of the case it was an "abuse of the trial court's discretion" to refuse to allow the defense to reopen its case for the defendant's testimony.
The court noted that defense counsel had told the jury in his opening statement that the defendant would testify. The court also noted that although the State had announced it had no rebuttal witnesses, it would not have been prejudiced by allowing the defendant to testify because it would still have had the opportunity to call any rebuttal witnesses it needed to counter the defendant's testimony. In addition, the defendant's decision to testify came while the court was still perusing the records, and his testimony would not have unduly disrupted the proceedings. After employing this "abuse of discretion" test, the Court then further stated:
Because "the most important witness for the defense in many criminal cases is the defendant himself," Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) deemed the accused's right to present his or her testimony at trial "[e]ven more fundamental to a personal defense than the right of self-representation" under the Sixth Amendment. Rock, 483 U.S. at 52, 107 S.Ct. at 2709; see also United States v. Walker, 772 F.2d 1172, 1179 (5th Cir.1985) ("Where the very point of a trial is to determine whether an individual was involved *557 in criminal activity, the testimony of the individual himself must be considered of prime importance."). No matter how daunting the task, the accused therefore has the right to face jurors and address them directly without regard to the probabilities of success. As with the right of self-representation, denial of the accused's right to testify is not amenable to harmless-error analysis. The right "is either respected or denied; its deprivation cannot be harmless." McKaskle v. Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 950 n. 8, 79 L.Ed.2d 122 (1984).
Dauzart, at pp. 6-7, 769 So.2d at 1210-1211. In McKaskle, cited by the Court, the U.S. Supreme Court held that a defendant's right to conduct his own defense was not violated by the unsolicited participation of standby counsel.
Since this application has been pending in this court the Louisiana Supreme Court decided State v. Hampton, 00-0522 (La.3/22/02), 818 So.2d 720, wherein the Court found that the violation of the right to testify was a structural error for which a harmless test could not be used. In Hampton, the defendant wanted to testify, but his counsel told him that he could not do so because he (counsel) controlled the decision as to whether the defendant would testify, and in his opinion it was not in the defendant's best interest to do so. The defendant did not testify, and he subsequently filed a motion for new trial contending his right to testify had been violated. The trial court agreed and ordered a new trial. The State took writs, and The Fourth Circuit reversed, finding that this error was harmless in this case. State v. Hampton, 99-2142 (La.App. 4 Cir. 1/18/00), unpub. On review, the Court reversed this court, reinstating the trial court's grant of a new trial. The Court noted that a defendant's right to testify is encompassed within the Fifth Amendment privilege against self-incrimination, the Sixth Amendment right to compulsory process, and the Fourteenth Amendment's due process clause, as well as in La. Const. art. 1, § 16. The Court cited Rock and its progeny in the U.S. Circuit Courts, which held that a defendant's right to testify can only be waived by him. The Court then addressed the issue of whether such error is amenable to a harmless error standard. The Court, on rehearing, clarified that it relied on State v. Dauzart, supra, to find that the deprivation of the right to testify is not amendable to harmless error analysis. The Court reiterated its conclusion on original hearing that "whenever a defendant is prevented from testifying after unequivocally expressing his desire to do so, the defendant has been denied a fundamental right and suffers prejudice."
Here, the relator was denied his right to testify in his own behalf based upon the improper actions of the State in the other case. Indeed, the relator's case is more egregious in that it was the State's intentional hiding of exculpatory evidence in the armed robbery case that led to his improper conviction in that case and his subsequent decision not to testify in the instant case because of the improper conviction. Because Hampton baldly stated that the violation of a defendant's right to testify in his own behalf cannot be reviewed under a harmless error standard, this court cannot employ one in this case. Relator's first and second claims have merit, and the trial court erred by denying his application for post conviction relief on the grounds that his rights to testify in his own behalf and present his defense were violated.
Accordingly, based on Hampton, supra, we conclude the trial court erred by denying the relator's application for post conviction relief. Therefore his writ application *558 is granted, and the ruling of the trial court is reversed. Relator's conviction and sentence are reversed, and the case remanded for further proceedings consistent with the views expressed herein.
WRIT APPLICATION GRANTED; JUDGMENT DENYING APPLICATION FOR POST CONVICTION RELIEF REVERSED; RELATOR'S CONVICTION AND SENTENCE REVERSED AND THE CASE IS REMANDED.
NOTES
[1] Art. 930.8A(1) provides that the two-year time limitation for seeking post conviction relief does not apply where: "The application alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his attorney."