*79 Justice Ginsburg,
with whom Justice Breyer, Justice Sotomayor, and Justice Kagan join, dissenting.
In Brady v. Maryland, 373 U. S. 83, 87 (1963), this Court held that due process requires the prosecution to turn over evidence favorable to the accused and material to his guilt or punishment. That obligation, the parties have stipulated, was dishonored in this case; consequently, John Thompson spent 18 years in prison, 14 of them isolated on death row, before the truth came to light: He was innocent of the charge of attempted armed robbery, and his subsequent trial on a murder charge, by prosecutorial design, was fundamentally unfair.
The Court holds that the Orleans Parish District Attorney’s Office (District Attorney’s Office or Office) cannot be held liable, in a civil rights action under 42 U. S. C. § 1983, for the grave injustice Thompson suffered. That is so, the Court tells us, because Thompson has shown only an aberrant Brody violation, not a routine practice of giving short shrift to Brady’s requirements. The evidence presented to the jury that awarded compensation to Thompson, however, points distinctly away from the Court’s assessment. As the trial record in the § 1983 action reveals, the conceded, long-concealed prosecutorial transgressions were neither isolated nor atypical.
From the top down, the evidence showed, members of the District Attorney’s Office, including the District Attorney himself, misperceived Brady’s compass and therefore inadequately attended to their disclosure obligations. Throughout the pretrial and trial proceedings against Thompson, the team of four engaged in prosecuting him for armed robbery and murder hid from the defense and the court exculpatory information Thompson requested and had a constitutional right to receive. The prosecutors did so despite multiple opportunities, spanning nearly two decades, to set the record straight. Based on the prosecutors’ conduct relating to Thompson’s trials, a fact trier could reasonably conclude that *80 inattention to Brady was standard operating procedure at the District Attorney’s Office.
What happened here, the Court’s opinion obscures, was no momentary oversight, no single incident of a lone officer’s misconduct. Instead, the evidence demonstrated that misperception and disregard of Brady’s disclosure requirements were pervasive in Orleans Parish. That evidence, I would hold, established persistent, deliberately indifferent conduct for which the District Attorney’s Office bears responsibility under § 1983.
I dissent from the Court’s judgment mindful that Brady violations, as this case illustrates, are not easily detected. But for a chance discovery made by a defense team investigator weeks before Thompson’s scheduled execution, the evidence that led to his exoneration might have remained under wraps. The prosecutorial concealment Thompson encountered, however, is bound to be repeated unless municipal agencies bear responsibility — made tangible by § 1983 liability — for adequately conveying what Brady requires and for monitoring staff compliance. Failure to train, this Court has said, can give rise to municipal liability under § 1983 “where the failure . . . amounts to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.” Canton v. Harris, 489 U. S. 378, 388 (1989). That standard is well met in this case.
I
I turn first to a contextual account of the Brady violations that infected Thompson’s trials.
A
In the early morning hours of December 6,1984, an assailant shot and killed Raymond T. Liuzza, Jr., son of a prominent New Orleans business executive, on the street fronting the victim’s home. Only one witness saw the assailant. As recorded in two contemporaneous police reports, that *81 eyewitness initially described the assailant as African-American, six feet tall, with “close cut hair.” Record EX2-EX3, EX9.[1] Thompson is five feet eight inches tall and, at the time of the murder, styled his hair in a large “Afro.” Id., at EX13. The police reports of the witness’ immediate identification were not disclosed to Thompson or to the court.
While engaged in the murder investigation, the Orleans Parish prosecutors linked Thompson to another violent crime committed three weeks later. On December 28, an assailant attempted to rob three siblings at gunpoint. During the struggle, the perpetrator’s blood stained the oldest child’s pant leg. That blood, preserved on a swatch of fabric cut from the pant leg by a crime scene analyst, was eventually tested. The test conclusively established that the perpetrator’s blood was type B. Id., at EX151. Thompson’s blood is type O. His prosecutors failed to disclose the existence of the swatch or the test results.
B
One month after the Liuzza murder, Richard Perkins, a man who knew Thompson, approached the Liuzza family. Perkins did so after the family’s announcement of a $15,000 reward for information leading to the murderer’s conviction. Police officers surreptitiously recorded the Perkins-Liuzza conversations.[2] As documented on tape, Perkins told the family, “I don’t mind helping [you] catch [the perpetrator], ... but I would like [you] to help me and, you know, I’ll help *82 [you].” Id., at EX479, EX481. Once the family assured Perkins, “we’re on your side, we want to try and help you,” id., at EX481, Perkins intimated that Thompson and another man, Kevin Freeman, had been involved in Liuzza’s murder. Perkins thereafter told the police what he had learned from Freeman about the murder, and that information was recorded in a police report. Based on Perkins’ account, Thompson and Freeman were arrested on murder charges.
Freeman was six feet tall and went by the name “Kojak” because he kept his hair so closely trimmed that his scalp was visible. Unlike Thompson, Freeman fit the eyewitness’ initial description of the Liuzza assailant’s height and hair style. As the Court notes, ante, at 56, n. 2, Freeman became the key witness for the prosecution at Thompson’s trial for the murder of Liuzza.
After Thompson’s arrest for the Liuzza murder, the father of the armed robbery victims saw a newspaper photo of Thompson with a large Afro hairstyle and showed it to his children. He reported to the District Attorney’s Office that the children had identified Thompson as their attacker, and the children then picked that same photo out of a “photographic lineup.” Record EX120, EX642-EX643. Indicting Thompson on the basis of these questionable identifications, the District Attorney’s Office did not pause to test the pant leg swatch dyed by the perpetrator’s blood. This lapse ignored or overlooked a prosecutor’s notation that the Office “may wish to do [a] blood test.” Id., at EX122.
The murder trial was scheduled to begin in mid-March 1985. Armed with the later indictment against Thompson for robbery, however, the prosecutors made a strategic choice: They switched the order of the two trials, proceeding first on the robbery indictment. Id., at EX128-EX129. Their aim was twofold. A robbery conviction gained first would serve to inhibit Thompson from testifying in his own defense at the murder trial, for the prior conviction could be *83 used to impeach his credibility. In addition, an armed robbery conviction could be invoked at the penalty phase of the murder trial in support of the prosecution’s plea for the death penalty. Id., at 682.
Recognizing the need for an effective prosecution team, petitioner Harry F. Connick, District Attorney for the Parish of Orleans, appointed his third-in-command, Eric Dubelier, as special prosecutor in both cases. Dubelier enlisted Jim Williams to try the armed robbery ease and to assist him in the murder case. Gerry Deegan assisted Williams in the armed robbery ease. Bruce Whittaker, the fourth prosecutor involved in the cases, had approved Thompson’s armed robbery indictment.[3]
C
During pretrial proceedings in the armed robbery case, Thompson filed a motion requesting access to all materials and information “favorable to the defendant” and “material and relevant to the issue of guilt or punishment,” as well as “any results or reports” of “scientific tests or experiments.” Id., at EX144, EX145. Prosecutorial responses to this motion fell far short of Brady compliance.[4]
*84 First, prosecutors blocked defense counsel’s inspection of the pant leg swatch stained by the robber’s blood. Although Dubelier’s April 3 response stated, “Inspection to be permitted,” id., at EX149, the swatch was signed out from the property room at 10:05 a.m. the next day, and was not returned until noon on April 10, the day before trial, id., at EX43, EX670. Thompson’s attorney inspected the evidence made available to him and found no blood evidence. No one told defense counsel about the swatch and its recent removal from the property room. Id., at EX701-EX702; Tr. 400-402. But cf. ante, at 69, n. 11 (Thompson’s attorney had “access to the evidence locker where the swatch was recorded as evidence.”).[5]
Second, Dubelier or Whittaker ordered the crime laboratory to rush a pretrial test of the swatch. Tr. 952-954. Whittaker received the lab report, addressed to his attention, two days before trial commenced. Immediately thereafter, he placed the lab report on Williams’ desk. Record EX151, EX589. Although the lab report conclusively identified the perpetrator’s blood type, id., at EX151, the District Attorney’s Office never revealed the report to the defense.[6]
*85 Third, Deegan checked the swatch out of the property room on the morning of the first day of trial, but the prosecution did not produce the swatch at trial. Id., at EX43. Deegan did not return the swatch to the property room after trial, and the swatch has never been found. Tr. of Oral Arg. 37.
“[B]ased solely on the descriptions” provided by the three victims, Record 683, the jury convicted Thompson of attempted armed robbery. The court sentenced him to 49.5 years without possibility of parole — the maximum available sentence.
D
Prosecutors continued to disregard Brady during the murder trial, held in May 1985, at which the prosecution’s order-of-trial strategy achieved its aim.[7] By prosecuting Thompson for armed robbery first — and withholding blood evidence that might have exonerated Thompson of that charge — the District Attorney’s Office disabled Thompson from testifying in his own defense at the murder trial.[8] As earlier observed, see supra, at 82-83, impeaching use of the prior conviction would have severely undermined Thompson’s credibility. And because Thompson was effectively stopped from testifying in his own defense, the testimony of the witnesses against him gained force. The prosecution’s failure to reveal *86 evidence that could have impeached those witnesses helped to seal Thompson’s fate.
First, the prosecution undermined Thompson’s efforts to impeach Perkins. Perkins testified that he volunteered information to the police with no knowledge of reward money. Record EX366, EX372-EX373. Because prosecutors had not produced the audiotapes of Perkins’ conversations with the Liuzza family (or a police summary of the tapes), Thompson’s attorneys could do little to cast doubt on Perkins’ credibility. In closing argument, the prosecution emphasized that Thompson presented no “direct evidence” that reward money had motivated any of the witnesses. Id., at EX3171-EX3172.
Second, the prosecution impeded Thompson’s impeachment of key witness Kevin Freeman. It did so by failing to disclose a police report containing Perkins’ account of what he had learned from Freeman about the murder. See swpra, at 82. Freeman’s trial testimony was materially inconsistent with that report. Tr. 382-384, 612-614; Record EX270-EX274. Lacking any knowledge of the police report, Thompson could not point to the inconsistencies.
Third, and most vital, the eyewitness’ initial description of the assailant’s hair, see supra, at 81, was of prime relevance, for it suggested that Freeman, not Thompson, murdered Liuzza, see supra, at 82. The materiality of the eyewitness’ contemporaneous description of the murderer should have been altogether apparent to the prosecution. Failure to produce the police reports setting out what the eyewitness first said not only undermined efforts to impeach that witness and the police officer who initially interviewed him. The omission left defense counsel without knowledge that the prosecutors were restyling the killer’s “close cut hair” into an “Afro.”
Prosecutors finessed the discrepancy between the eyewitness’ initial description and Thompson’s appearance. They asked leading questions prompting the eyewitness to agree *87 on the stand that the perpetrator’s hair was “afro type,” yet “straight back.” Record EX322-EX323. Corroboratively, the police officer — after refreshing his recollection by reviewing material at the prosecution’s table — gave artful testimony. He characterized the witness’ initial description of the perpetrator’s hair as “black and short, afro style.” Id., at EX265 (emphasis added). As prosecutors well knew, nothing in the withheld police reports, which described the murderer’s hair simply as “close cut,” portrayed a perpetrator with an Afro or Afro-style hair.
The jury found Thompson guilty of first-degree murder. Having prevented Thompson from testifying that Freeman was the killer, the prosecution delivered its ultimate argument. Because Thompson was already serving a near-life sentence for attempted armed robbery, the prosecution urged, the only way to punish him for murder was to execute him. The strategy worked as planned; Thompson was sentenced to death.
E
Thompson discovered the prosecutors’ misconduct through a serendipitous series of events. In 1994, nine years after Thompson’s convictions, Deegan, the assistant prosecutor in the armed robbery trial, learned he was terminally ill. Soon thereafter, Deegan confessed to his friend Michael Riehlmann that he had suppressed blood evidence in the armed robbery case. Id., at EX709. Deegan did not heed Riehlmann’s counsel to reveal what he had done. For five years, Riehlmann, himself a former Orleans Parish prosecutor, kept Deegan’s confession to himself. Id., at EX712-EX713.
On April 16, 1999, the State of Louisiana scheduled Thompson’s execution. Id., at EX1366-EX1367. In an eleventh-hour effort to save his life, Thompson’s attorneys hired a private investigator. Deep in the crime lab archives, the investigator unearthed a microfiche copy of the lab report identifying the robber’s blood type. The copy showed that the report had been addressed to Whittaker. See *88 supra, at 84. Thompson's attorneys contacted Whittaker, who informed Riehlmann that the lab report had been found. Riehlmann thereupon told Whittaker that Deegan “had failed to turn over stuff that might have been exculpatory.” Tr. 718. Riehlmann prepared an affidavit describing Deegan’s disclosure “that he had intentionally suppressed blood evidence in the armed robbery trial of John Thompson.” Record EX583.
Thompson's lawyers presented to the trial court the crime lab report showing that the robber’s blood type was B, and a report identifying Thompson’s blood type as O. This evidence proved Thompson innocent of the robbery. The court immediately stayed Thompson’s execution, id., at EX590, and commenced proceedings to assess the newly discovered evidence.
Connick sought an abbreviated hearing. A full hearing was unnecessary, he urged, because the Office had confessed error and had moved to dismiss the armed robbery charges. See, e. g., id., at EX617. The court insisted on a public hearing. Given “the history of this case,” the court said, it “was not willing to accept the representations that [Connick] and [his] office made [in their motion to dismiss],” id., at EX882. After a full day’s hearing, the court vacated Thompson’s attempted armed robbery conviction and dismissed the charges. Before doing so, the court admonished:
“[A]ll day long there have been a number of young Assistant D. A.’s . . . sitting in this courtroom watching this, and I hope they take home . . . and take to heart the message that this kind of conduct cannot go on in this Parish if this Criminal Justice System is going to work.” Id., at EX883.
The District Attorney’s Office then initiated grand jury proceedings against the prosecutors who had withheld the lab report. Connick terminated the grand jury after just one day. He maintained that the lab report would not be *89 Brady material if prosecutors did not know Thompson’s blood type. Tr. 986; cf. swpra, at 84-85, n. 6. And he told the investigating prosecutor that the grand jury “w[ould] make [his] job more difficult.” Tr. 978-979. In protest, that prosecutor tendered his resignation.
F
Thereafter, the Louisiana Court of Appeal reversed Thompson’s murder conviction. State v. Thompson, 2002-0361, p. 10 (7/17/02), 825 So. 2d 552, 558. The unlawfully procured robbery conviction, the court held, had violated Thompson’s right to testify and thus fully present his defense in the murder trial. Id., at 557. The merits of several Brady claims arising out of the murder trial, the court observed, had therefore become “moot.” 825 So. 2d, at 555; see also Record 684.[9] But cf. ante, at 63, n. 7, 69, n. 11 (suggesting that there were no Brady violations in the murder prosecution because no court had adjudicated any violations).[10]
*90 Undeterred by his assistants’ disregard of Thompson’s rights, Connick retried him for the Liuzza murder. Thompson’s defense was bolstered by evidence earlier unavailable to him: ten exhibits the prosecution had not disclosed when Thompson was first tried. The newly produced items included police reports describing the assailant in the murder case as having “close cut” hair, the police report recounting Perkins’ meetings with the Liuzza family, see supra, at 81-82, audio recordings of those meetings, and a 35-page supplemental police report. After deliberating for only 35 minutes, the jury found Thompson not guilty.
On May 9, 2003, having served more than 18 years in prison for crimes he did not commit, Thompson was released.
II
On July 16, 2003, Thompson commenced a civil action under 42 U. S. C. § 1983 alleging that Connick, other officials of the Orleans Parish District Attorney’s Office, and the Of *91 fice itself, had violated his constitutional rights by wrongfully withholding Brady evidence. Thompson sought to hold Connick and the District Attorney’s Office liable for failure adequately to train prosecutors concerning their Brady obligations. Such liability attaches, I agree with the Court, only when the failure “amount[s] to ‘deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.’” Ante, at 61 (quoting Canton v. Harris, 489 U. S., at 388). I disagree, however, with the Court’s conclusion that Thompson failed to prove deliberate indifference.
Having weighed all the evidence, the jury in the § 1983 case found for Thompson, concluding that the District Attorney’s Office had been deliberately indifferent to Thompson’s Brady rights and to the need for training and supervision to safeguard those rights. “Viewing the evidence in the light most favorable to [Thompson], as appropriate in light of the verdic[t] rendered by the jury,” Patrick v. Burget, 486 U. S. 94, 98, n. 3 (1988), I see no cause to upset the District Court’s determination, affirmed by the Fifth Circuit, that “ample evidence . . . adduced at trial” supported the jury’s verdict. Record 1917.
Over 20 years ago, we observed that a municipality’s failure to provide training may be so egregious that, even without notice of prior constitutional violations, the failure “could properly be characterized as ‘deliberate indifference’ to constitutional rights.” Canton, 489 U. S., at 390, n. 10. “[I]n light of the duties assigned to specific officers or employees,” Canton recognized, “it may happen that . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.” Id., at 390. Thompson presented convincing evidence to satisfy this standard.
*92 A
Thompson’s § 1983 suit proceeded to a jury trial on two theories of liability: First, the Orleans Parish Office’s official Brady policy was unconstitutional; and second, Connick was deliberately indifferent to an obvious need to train his prosecutors about their Brady obligations. Connick’s Brady policy directed prosecutors to “turn over what was required by state and federal law, but no more.” Brief for Petitioners 6-7. The jury thus understandably rejected Thompson’s claim that the official policy itself was unconstitutional. Ante, at 57.
The jury found, however, that Connick was deliberately indifferent to the need to train prosecutors about Brady's command. On the special verdict form, the jury answered yes to the following question:
“Was the Brady violation in the armed robbery case or any infringements of John Thompson’s rights in the murder trial substantially caused by [Connick’s] failure, through deliberate indifference, to establish policies and procedures to protect one accused of a crime from these constitutional violations?” Record 1585.
Consistent with the question put to the jury, and without objection, the court instructed the jurors: “[Y]ou are not limited to the nonproduced blood evidence and the resulting infringement of Mr. Thompson’s right to testify at the murder trial. You may consider all of the evidence presented during this trial.” Tr. 1099; Record 1620.[11] But cf. ante, at 54, 59, *93 63, n. 7, 68; ante, at 72 (Scalia, J., concurring) (maintaining that the case involves a single Brady violation). That evidence included a stipulation that in his retrial for the Liuzza murder, Thompson had introduced ten exhibits containing relevant information withheld by the prosecution in 1985. See supra, at 90.
Abundant evidence supported the jury’s finding that additional Brady training was obviously necessary to ensure that Brady violations would not occur: (1) Connick, the Office’s sole policymaker, misunderstood Brady. (2) Other leaders in the Office, who bore direct responsibility for training less experienced prosecutors, were similarly uninformed about Brady. (3) Prosecutors in the Office received no Brady training. (4) The Office shirked its responsibility to keep prosecutors abreast of relevant legal developments concerning Brady requirements. As a result of these multiple shortfalls, it was hardly surprising that Brady violations in. fact occurred, severely undermining the integrity of Thompson’s trials.
1
Connick was the Office’s sole policymaker, and his testimony exposed a flawed understanding of a prosecutor’s Brady obligations. Connick admitted to the jury that his *94 earlier understanding of Brady, conveyed in prior sworn testimony, had been too narrow. Tr. 181-182. Even at trial Connick persisted in misstating Brady’s requirements. For example, Connick urged that there could be no Brady violation arising out of “the inadvertent conduct of [an] assistant under pressure with a lot of ease load.” Tr. 188-189. The court, however, correctly instructed the jury that, in determining whether there has been a Brady violation, the “good or bad faith of the prosecution does not matter.” Tr. 1094-1095.
2
The testimony of other leaders in the District Attorney’s Office revealed similar misunderstandings. Those misunderstandings, the jury could find, were in large part responsible for the gross disregard of Brady rights Thompson experienced. Dubelier admitted that he never reviewed police files, but simply relied on the police to flag any potential Brady information. Tr. 542. The court, however, instructed the jury that an individual prosecutor has a “duty ... to learn of any favorable evidence known to others acting on the government’s behalf in the case, including the police.” Id., at 1095; Record 1614. Williams was asked whether “Brady material includes documents in the possession of the district attorney that could be used to impeach a witness, to show that he’s lying”; he responded simply, and mistakenly, “No.” Tr. 381. The testimony of “high-ranking individuals in the Orleans Parish District Attorney’s Office,” Thompson’s expert explained,[12] exposed “complete errors ... as to what *95 Brady required [prosecutors] to do.” Id., at 427, 434. “Dubelier had no understanding of his obligations under Brady whatsoever,” id., at 458, the expert observed, and Williams “is still not sure what his obligations were under Brady,” id., at 448. But cf. ante, at 57 (“[I]t was undisputed at trial that the prosecutors were familiar with the general Brady requirement that the State disclose to the defense evidence in its possession that is favorable to the accused.”).
The jury could attribute the violations of Thompson’s rights directly to prosecutors’ misapprehension of Brady. The prosecution had no obligation to produce the “close-cut hair” police reports, Williams maintained, because newspaper reports had suggested that witness descriptions were not consistent with Thompson’s appearance. Therefore, Williams urged, the defense already “had everything.” Tr. 139. Dubelier tendered an alternative explanation for the nondisclosure. In Dubelier’s view, the descriptions were not “inconsistent with [Thompson’s] appearance,” as portrayed in a police photograph showing Thompson’s hair extending at least three inches above his forehead. Id., at 171-172; Record EX73. Williams insisted that he had discharged the prosecution’s duty to disclose the blood evidence by mentioning, in a motion hearing, that the prosecution intended to obtain a blood sample from Thompson. Tr. 393-394. During the armed robbery trial, Williams told one of the victims that the results of the blood test made on the swatch had been “inconclusive.” Id., at 962. And he testified in the §1983 action that the lab report was not Brady material “because I didn’t know what the blood type of Mr. Thompson was.” Tr. 393. But see supra, at 84, n. 5 (District Court instructed the jury that the lab report was Brady material).
*96 3
Connick should have comprehended that Orleans Parish prosecutors lacked essential guidance on Brady and its application. In fact, Connick has effectively conceded that Brady training in his Office was inadequate. Tr. of Oral Arg. 60. Connick explained to the jury that prosecutors’ offices must “make . . . very clear to [new prosecutors] what their responsibility [i]s” under Brady and must not “giv[e] them a lot of leeway.” Tr. 834-835. But the jury heard ample evidence that Connick’s Office gave prosecutors no Brady guidance, and had installed no procedures to monitor Brady compliance.
In 1985, Connick acknowledged, many of his prosecutors “were coming fresh out of law school,” and the Office’s “[h]uge turnover” allowed attorneys with little experience to advance quickly to supervisory positions. See Tr. 853-854, 832. By 1985, Dubelier and Williams were two of the highest ranking attorneys in the Office, id., at 342, 356-357, yet neither man had even five years of experience as a prosecutor, see supra, at 83, n. 3; Record EX746; Tr. 55, 571-576.
Dubelier and Williams learned the prosecutorial craft in Connick’s Office, and, as earlier observed, see supra, at' 95, their testimony manifested a woefully deficient understanding of Brady. Dubelier and Williams told the jury that they did not recall any Brady training in the Office. Tr. 170-171, 364.
Connick testified that he relied on supervisors, including Dubelier and Williams, to ensure prosecutors were familiar with their Brady obligations. Tr. 805-806. Yet Connick did not inquire whether the supervisors themselves understood the importance of teaching newer prosecutors about Brady. Riehlmann could not “recall that [he] was ever trained or instructed by anybody about [his] Brady obligations,” on the job or otherwise. Tr. 728-729. Whittaker agreed it was possible for “inexperienced lawyers, just a few weeks out of law school with no training,” to bear responsi *97 bility for “decisions on ... whether material was Brady material and had to be produced.” Id., at 319.
Thompson’s expert characterized Connick’s supervision regarding Brady as “the blind leading the blind.” Tr. 458. For example, in 1985 trial attorneys “sometimes . .. went to Mr. Connick” with Brady questions, “and he would tell them” how to proceed. Tr. 892. But Connick acknowledged that he had “stopped reading law books . . . and looking at opinions” when he was first elected District Attorney in 1974. Id., at 175-176.
As part of their training, prosecutors purportedly attended a pretrial conference with the Office’s chief of trials before taking a case to trial. Connick intended the practice to provide both training and accountability. But it achieved neither aim in Thompson’s prosecutions, for Dubelier and Williams, as senior prosecutors in the Office, were free to take cases to trial without pretrying them, and that is just how they proceeded in Thompson’s prosecutions. Id., at 901-902; Record 685. But cf. ante, at 65 (“[T]rial chiefs oversaw the preparation of the cases.”).
Prosecutors confirmed that training in the District Attorney’s Office, overall, was deficient. Soon after Connick retired, a survey of assistant district attorneys in the Office revealed that more than half felt that they had not received the training they needed to do their jobs. Tr. 178.
Thompson, it bears emphasis, is not complaining about the absence of formal training sessions. Tr. of Oral Arg. 55. But cf. ante, at 68. His complaint does not demand that Brady compliance be enforced in any particular way. He asks only that Brady obligations be communicated accurately and genuinely enforced.[13] Because that did not happen in *98 the District Attorney’s Office, it was inevitable that prosecutors would misapprehend Brady. Had Brady’s importance been brought home to prosecutors, surely at least one of the four officers who knew of the swatch and lab report would have revealed their existence to defense counsel and the court.[14]
4
Louisiana did not require continuing legal education at the time of Thompson’s trials. Tr. 361. But cf. ante, at 65. Primary responsibility for keeping prosecutors an courant with developments in the law, therefore, resided in the District Attorney’s Office. Over the course of Connick’s tenure as District Attorney, the jury learned, the Office’s chief of appeals circulated memoranda when appellate courts issued important opinions. Tr. 751-754, 798.
The 1987 Office policy manual was a compilation of memoranda on criminal law and practice circulated to prosecutors from 1974, when Connick became District Attorney, through 1987. Id., at 798. The manual contained four sentences, nothing more, on Brady.[15] This slim instruction, the jury *99 learned, was notably inaccurate, incomplete, and dated. Tr. 798-804, 911-918. But cf. ante, at 65 (“Senior attorneys also circulated court decisions and instructional memoranda to keep the prosecutors abreast of relevant legal developments.”). For example, the manual did not acknowledge what Giglio v. United States, 405 U. S. 150 (1972), made plain: Impeachment evidence is Brady material prosecutors are obligated to disclose.[16]
*100 In sum, the evidence permitted the jury to reach the following conclusions. First, Connick did not ensure that prosecutors in his Office knew their Brady obligations; he neither confirmed their familiarity with Brady when he hired them, nor saw to it that training took place on his watch. Second, the need for Brady training and monitoring was obvious to Connick. Indeed he so testified. Third, Connick’s cavalier approach to his staff’s knowledge and observation of Brady requirements contributed to a culture of inattention to Brady in Orleans Parish.
As earlier noted, see supra, at 88-89, Connick resisted an effort to hold prosecutors accountable for Brady compliance because he felt the effort would “make [his] job more difficult.” Tr. 978. He never disciplined or fired a single prosecutor for violating Brady. Tr. 182-183. The jury was told of this Court’s decision in Kyles v. Whitley, 514 U. S. 419 (1995), a capital case prosecuted by Connick’s Office that garnered attention because it featured “so many instances of the state’s failure to disclose exculpatory evidence.” Id., at 455 (Stevens, J., concurring). When questioned about Kyles, Connick told the jury he was satisfied with his Office’s practices and saw no need, occasioned by Kyles, to make any changes. Tr. 184-185. In both quantity and quality, then, the evidence canvassed here was more than sufficient to warrant a jury determination that Connick and the prosecutors who served under him were not merely negligent regarding Brady. Rather, they were deliberately indifferent to what the law requires.
B
In Canton, this Court spoke of circumstances in which the need for training may be “so obvious,” and the lack of training “so likely” to result in constitutional violations, that policymakers who do not provide for the requisite training “can reasonably be said to have been deliberately indifferent to the need” for such training. 489 U. S., at 390. *101 This case, I am convinced, belongs in the category Canton marked out.
Canton offered an often-cited illustration. “[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.” Ibid., n. 10. Those policymakers, Canton observed, equip police officers with firearms to facilitate such arrests. Ibid. The need to instruct armed officers about “constitutional limitations on the use of deadly force,” Canton said, is “‘so obvious,’ that failure to [train the officers] could properly be characterized as ‘deliberate indifference’ to constitutional rights.” Ibid.
The District Court, tracking Canton’s language, instructed the jury that Thompson could prevail on his “deliberate indifference” claim only if the evidence persuaded the jury on three points. First, Connick “was certain that prosecutors would confront the situation where they would have to decide which evidence was required by the Constitution to be provided to the accused.” Tr. 1099. Second, “the situation involved a difficult choice[,] or one that prosecutors had a history of mishandling, such that additional training, supervision or monitoring was clearly needed.” Ibid. Third, “the wrong choice by a prosecutor in that situation would frequently cause a deprivation of an accused’s constitutional rights.” Ibid.; Record 1619-1620; see Canton, 489 U. S., at 390, and n. 10; Walker v. New York, 974 F. 2d 293, 297-298 (CA2 1992).[17]
*102 Petitioners used this formulation of the failure to train standard in pretrial and post-trial submissions, Record 1256— 1257, 1662, and in their own proposed jury instruction on deliberate indifference.[18] Nor do petitioners dispute that *103 Connick “kn[e]w to a moral certainty that” his prosecutors would regularly face Brady decisions. See Canton, 489 U. S., at 390, n. 10.
The jury, furthermore, could reasonably find that Brady rights may involve choices so difficult that Connick obviously knew or should have known prosecutors needed more than perfunctory training to make the correct choices. See Canton, 489 U. S., at 390, and n. 10.[19] As demonstrated earlier, see supra, at 94-96, even at trial prosecutors failed to give an accurate account of their Brady obligations. And, again as emphasized earlier, see supra, at 96-98, the evidence permitted the jury to conclude that Connick should have known Brady training in his office bordered on “zero.” See Tr. of Oral Arg. 41. Moreover, Connick understood that newer prosecutors needed “very clear” guidance and should not be left to grapple with Brady on their own. Tr. 834-835. It was thus “obvious” to him, the jury could find, that constitutional rights would be in jeopardy if prosecutors received slim to no Brady training.
Based on the evidence presented, the jury could conclude that Brady errors by untrained prosecutors would frequently cause deprivations of defendants’ constitutional rights. The jury learned of several Brady oversights in Thompson’s trials and heard testimony that Connick’s Office had one of the worst Brady records in the country. Tr. 163. Because prosecutors faced considerable pressure to get convictions, id., at 317, 341, and were instructed to “turn over what was required by state and federal law, but no more,” Brief for *104 Petitioners 6-7, the risk was all too real that they would err by withholding rather than revealing information favorable to the defense.
In sum, despite Justice Scalia’s protestations to the contrary, ante, at 72, 76, the Brady violations in Thompson’s prosecutions were not singular and they were not aberrational. They were just what one would expect given the attitude toward Brady pervasive in the District Attorney’s Office. Thompson demonstrated that no fewer than five prosecutors — the four trial prosecutors and Riehlmann — disregarded his Brady rights. He established that they kept from him, year upon year, evidence vital to his defense. Their conduct, he showed with equal force, was a foreseeable consequence of lax training in, and absence of monitoring of, a legal requirement fundamental to a fair trial.[20]
*105 c
Unquestionably, a municipality that leaves police officers untrained in constitutional limits on the use of deadly weapons places lives in jeopardy. Canton, 489 U. S., at 390, n. 10. But as this case so vividly shows, a municipality that empowers prosecutors to press for a death sentence without ensuring that those prosecutors know and honor Brady rights may be no less “deliberately indifferent” to the risk to innocent lives.
Brady, this Court has long recognized, is among the most basic safeguards brigading a criminal defendant’s fair trial right. See Cone v. Bell, 556 U. S. 449, 451 (2009). See also United States v. Bagley, 473 U. S. 667, 695 (1985) (Marshall, J., dissenting). Vigilance in superintending prosecutors’ attention to Brady’s requirement is all the more important for *106 this reason: A Brady violation, by its nature, causes suppression of evidence beyond the defendant’s capacity to ferret out. Because the absence of the withheld evidence may result in the conviction of an innocent defendant, it is unconscionable not to impose reasonable controls impelling prosecutors to bring the information to light.
The Court nevertheless holds Canton’s example inapposite. It maintains that professional obligations, ethics rules, and training — including on-the-job training — set attorneys apart from other municipal employees, including rookie police officers. Ante, at 64-68. Conniek “had every incentive at trial to attempt to establish” that he could reasonably rely on the professional education and status of his staff. Cf. ante, at 62, n. 6. But the jury heard and rejected his argument to that effect. Tr. 364, 576-577, 834-835.
The Court advances Connick’s argument with greater clarity, but with no greater support. On what basis can one be confident that law schools acquaint students with prosecutors’ unique obligation under Brady? Whittaker told the jury he did not recall covering Brady in his criminal procedure class in law school. Tr. 335. Dubelier’s alma mater, like most other law faculties, does not make criminal procedure a required course.[21]
Conniek suggested that the bar examination ensures that new attorneys will know what Brady demands. Tr. 835. Research indicates, however, that from 1980 to the present, Brady questions have not accounted for even 10% of the total points in the criminal law and procedure section of any administration of the Louisiana Bar Examination.[22] A person sitting for the Louisiana Bar Examination, moreover, need *107 pass only five of the exam's nine sections.[23] One can qualify for admission to the profession with no showing of even passing knowledge of criminal law and procedure.
The majority’s suggestion that lawyers do not need Brady training because they “are equipped with the tools to find, interpret, and apply legal principles,” ante, at 70, “blinks reality” and is belied by the facts of this case. See Brief for Former Federal Civil Rights Officials and Prosecutors as Amici Curiae 13 (hereinafter Prosecutors Brief). Connick himself recognized that his prosecutors, because of their inexperience, were not so equipped. Indeed, “understanding and complying with Brady obligations are not easy tasks, and the appropriate way to resolve Brady issues is not always self-evident.” Prosecutors Brief 6. “Brady compliance,” therefore, “is too much at risk, and too fundamental to the fairness of our criminal justice system, to be taken for granted,” and “training remains critical.” Id., at 3, 7.
The majority further suggests that a prior pattern of similar violations is necessary to show deliberate indifference to defendants’ Brady rights. See ante, at 57-59, and n. 4,63-64.[24] *108 The text of § 1983 contains no such limitation.[25] Nor is there any reason to imply such a limitation.[26] A district attorney's deliberate indifference might be shown in several ways short of a prior pattern.[27] This case is one such instance. Connick created a tinderbox in Orleans Parish in which Brady violations were nigh inevitable. And when they did occur, Connick insisted there was no need to change anything, and opposed efforts to hold prosecutors accountable on the ground that doing so would make his job more difficult.
A district attorney aware of his office's high turnover rate, who recruits prosecutors fresh out of law school and promotes them rapidly through the ranks, bears responsibility *109 for ensuring that on-the-job training takes place. In short, the buck stops with him.[28] As the Court recognizes, “the duty to produce Brady evidence to the defense” is “[a]mong prosecutors’ unique ethical obligations.” Ante, at 66. The evidence in this case presents overwhelming support for the conclusion that the Orleans Parish Office slighted its responsibility to the profession and to the State’s system of justice by providing no on-the-job Brady training. Connick was not “entitled to rely on prosecutors’ professional training,” ante, at 67, for Connick himself should have been the principal insurer of that training.
* * *
For the reasons stated, I would affirm the judgment of the U. S. Court of Appeals for the Fifth Circuit. Like that court and, before it, the District Court, I would uphold the jury’s verdict awarding damages to Thompson for the gross, deliberately indifferent, and long-continuing violation of his fair trial right.

 Exhibits entered into evidence in Thompson’s §1983 trial are herein cited by reference to the page number in the exhibit binder compiled by the District Court and included in the record on appeal.

 The majority endorses the Fifth Circuit’s conclusion that, when Thompson was tried for murder, no Brady violation occurred with respect to these audio tapes “[bjecause defense counsel had knowledge of such evidence and could easily have requested access from the prosecution.” Thompson v. Cain, 161 F. 3d 802, 806-807 (1998); ante, at 69, n. 11. The basis for that asserted “knowledge” is a mystery. The recordings secretly made did not come to light until long after Thompson’s trials.

 At the time of their assignment, Dubelier had served in the District Attorney’s Office for three and a half years, Williams, for four and a half years, Deegan, a recent law school graduate, for less than one year, and Whittaker, for three years.

 Connick did not dispute that failure to disclose the swatch and the crime lab report violated Brady. See Tr. 46, 1095. But cf. ante, at 57, 59 (limiting Conniek’s concession, as Connick himself did not, to failure to disclose the crime lab report).
In Justice Scalia’s contrary view, “[t]here was probably no Brady violation at all,” or, if there was any violation of Thompson’s rights, it “was surely on the very frontier of our Brady jurisprudence,” such that “Con-nick could not possibly have been on notice” of the need to train. Ante, at 78. Conniek’s counsel, however, saw the matter differently. “[A]ny reasonable prosecutor would have recognized blood evidence as Brady material,” he said, indeed “the proper response” was “obvious to all.” Record 1663,1665.

 The majority assails as “highly suspect” the suggestion that prosecutors violated Brady by failing to disclose the bloodstained swatch. See ante, at 69, n. 11. But the parties stipulated in Thompson’s § 1983 action, and the jury was so informed, that, “[p]rior to the armed robbery trial, Mr. Thompson and his attorneys were not advised of the existence of the blood evidence, that the evidence had been tested, [or] that a blood type was determined definitively from the swatch . . . .” Tr. 46. Consistent with this stipulation, Thompson’s trial counsel testified that he spoke to “[t]he clerk who maintained] the evidence” and learned that “[t]hey didn't have any blood evidence.” Id., at 401. And the District Court instructed the jury, with no objection from Conniek, “that the nonproduced blood evidence . . . violated [Thompson’s] constitutional rights as a matter of law.” Id., at 1095.

Justice Scalia questions petitioners’ concession that Brady was violated when the prosecution failed to inform Thompson of the blood evidence. He considers the evidence outside Brady because the prosecution did not endeavor to test Thompson’s blood, and therefore avoided knowing *85 that the evidence was in fact exculpatory. Ante, at 77-78. Such a “don’t ask, don’t tell” view of a prosecutor’s Brady obligations garners no support from precedent. See also supra, at 83, n. 4; infra, at 98, n. 13.

 During jury deliberations in the armed robbery case, Williams, the only Orleans Parish trial attorney common to the two prosecutions, told Thompson of his objective in no uncertain terms: “I’m going to fry you. You will die in the electric chair.” Tr. 252-253.

 The Louisiana Court of Appeal concluded, and Conniek does not dispute, that Thompson “would have testified in the absence of the attempted armed robbery conviction.” State v. Thompson, 2002-0361, p. 7 (7/17/02), 825 So. 2d 552, 556. But cf. ante, at 54, 55 (Thompson “elected” not to testify).

 Thompson argued that “the State failed to produce police reports ‘and other information’ which would have identified ‘eye- and ear-witnesses’ whose testimony would have exonerated him and inculpated [Freeman], . . . and would have shown that [Perkins,] . . . who stated [he] heard [Thompson] admit to committing the murder[,] had been promised reward money for [his] testimony.” Thompson, 825 So. 2d, at 555. In leaving these arguments unaddressed, the Louisiana Court of Appeal surely did not defer to the Fifth Circuit’s earlier assessment of those claims, made on an anemic record, in Thompson v. Cain, 161 F. 3d 802. Nor did the Louisiana Court of Appeal suggest that Thompson was “belatedly tr[ying] to reverse” the Fifth Circuit’s decision. But cf. ante, at 69, n. 11.

 The Court notes that in Thompson v. Cain, the Ffth Circuit rejected Brady claims raised by Thompson, characterizing one of those claims as “without merit.” Ante, at 69, n. 11 (quoting Thompson, 161 F. 3d, at 807); see supra, at 81, n. 2. The Court, however, overlooks the date of that Ffth Circuit decision. It was rendered before revelation of the Brady violations in the armed robbery trial, before Thompson had the opportunity for discovery in his § 1983 suit, and before Thompson or any court was aware of the “close cut hair” police reports. See Thompson, 161 F. 3d, at *90 812, n. 8. It is these later revelations, not the little Thompson knew in 1998, that should count. For example, the Fifth Circuit, in 1998, believed that Perkins’ statement recorded in the police report did not “differ from Freeman’s trial testimony.” Id., at 808. But evidence put before the jury in 2007 in the § 1983 trial showed that the police report, in several material respects, was inconsistent with Freeman’s trial testimony. Tr. 382-383.
Connick has never suggested to this Court that the jury in the § 1983 trial was bound by the Fifth Circuit’s 1998 Brady rulings. That court “a£ford[ed] great deference to” the state trial court’s findings, made after a 1995 postconviction relief hearing. Thompson, 161 F. 3d, at 805. The jury in the §1983 trial, of course, had far more extensive and accurate information on which to reach its decision. Moreover, as earlier noted, the same trial court that made the 1995 findings was, in 1999, outraged by the subsequently discovered Brady violations and by Connick’s reluctance to bring those violations to light. See supra, at 88. Certainly that judge would not have wanted the jury that assessed Connick’s deliberate indifference in the § 1983 trial to defer to findings he earlier made on a notably incomplete record.

 The court permitted Thompson to introduce evidence of other Brady violations, but because “the blood evidence alone proved the violation [of Thompson’s constitutional rights],” the court declined specifically “to ask the jury [whether] this other stuff [was] also Brady.” Tr. 1003. The court allowed Thompson to submit proof of other violations to “sho[w] the cumulative nature .. . and impact [of] evidence .. . as to . .. the training and deliberate indifference . . . .” Ibid. But cf. ante, at 69, n. 11 (questioning how “these violations are relevant” to this case). Far from indulg *93 ing in my own factfindings, but ef. ibid., I simply recite the evidence supporting the jury’s verdict in Thompson’s § 1983 trial.
The Court misleadingly states that “the District Court instructed the jury that the ‘only issue’ was whether the nondisclosure [of the crime lab report] was caused by either a policy, practice, or custom of the district attorney’s office or a deliberately indifferent failure to train the office’s prosecutors.” Ante, at 57. The jury instruction the majority cites simply directed the jury that, with regard to the blood evidence, as a matter of law, Thompson’s constitutional rights had been violated. Record 1614-1615. The court did not preclude the jury from assessing evidence of other infringements of Thompson’s rights. Id., at 1585; see Kyles v. Whitley, 514 U. S. 419, 421 (1995) (“[T]he state’s obligation under Brady . . . turns on the cumulative effect of all. . . evidence suppressed by the government....”).

 With no objection from petitioners, the court found Thompson’s expert, Joseph Lawless, qualified to testify as an expert in criminal law and procedure. Tr. 419, 426. Lawless has practiced criminal law for 30 years; from 1976 to 1979, he was an Assistant District Attorney, and thereafter he entered private practice. Id., at 412. He is the author of Prosecutorial Misconduct: Law, Procedure, Forms (4th ed. 2008), first published in 1985. Tr. 414. The text is used in a class on ethics and tactics for the *95 criminal lawyer at Harvard Law School and in the federal defender training program of the Administrative Office of the United States Courts. Id., at 416.

 To ward off Brady violations of the kind Connick conceded, for example, Connick could have communicated to Orleans Parish prosecutors, in no uncertain terms, that, “[i]f you have physical evidence that, if tested, can establish the innocence of the person who is charged, you have to turn it over.” Tr. of Oral Arg. 34; id., at 36 (“[I]f you have evidence that can *98 conclusively establish to a scientific certainty the innocence of the person being charged, you have to turn it over . . . .”). Or Connick could have told prosecutors what he told the jury when he was asked whether a prosecutor must disclose a crime lab report to the defense, even if the prosecutor does not know the defendant’s blood type: “Under the law it qualifies as Brady material. Under Louisiana law we must turn that over. Under Brady we must turn that over.” Tr. 872. But cf. ante, at 78 (Scaua, J., concurring) (questioning how Connick could have been on notice of the need to train prosecutors about the Brady violations conceded in this ease).

 The Court can scarcely disagree with respect to Dubelier, Williams, and Whittaker, for it acknowledges the “flagran[cy]” of Deegan’s conduct, see ante, at 60, n. 5, and does not dispute that, pretrial, other prosecutors knew of the existence of the swatch and lab report.

 Section 5.25 of the manual, titled “Brady Material,” states in full:
“In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so called Brady material — that is, information in the possession of the State which is exculpatory regarding the defendant. The duty to produce Brady material is ongoing and continues *99 throughout the entirety of the trial. Failure to produce Brady material has resulted in mistrials and reversals, as well as extended court battles over jeopardy issues. In all cases, a review of Brady issues, including apparently self-serving statements made by the defendant, must be included in a pré-trial conference and each Assistant must be familiar with the law regarding exculpatory information possessed by the State.” Record EX427.

 During the relevant time period, there were many significant developments in this Court’s Brady jurisprudence. Among the Brody-related decisions this Court handed down were United States v. Bagley, 473 U. S. 667, 676 (1985) (“This Court has rejected any . . . distinction between impeachment evidence and exculpatory evidence [in the Brady context].”); Weatherford v. Bursey, 429 U. S. 545, 559-560 (1977) (“Brady is not implicated ... where the only claim is that the State should have revealed that it would present the eyewitness testimony of a particular agent against the defendant at trial.”); and United States v. Agurs, 427 U. S. 97,103,104, 106-107 (1976) (Brady claim may arise when “the undisclosed evidence demonstrates that the prosecution’s case includes perjured testimony and that the prosecution knew, or should have known, of the perjury,” when defense counsel makes “a pretrial request for specific evidence” and the government fails to accede to that request, and when defense counsel makes no request and the government fails to disclose “obviously exculpatory” evidence). These decisions were not referenced in the manual that compiled circulated memoranda.
In the same period, the Louisiana Supreme Court issued dozens of opinions discussing Brady, including State v. Sylvester, 388 So. 2d 1155, 1161 (1980) (impeachment evidence must be disclosed in response to a specific request if it would create a “reasonable doubt that did not otherwise exist”); State v. Brooks, 386 So. 2d 1348,1351 (1980) (Brady extends to any material information favorable to the accused); and State v. Carney, 334 So. 2d 415, 418-419 (1976) (reversible error if prosecution fails, even inadvertently, to disclose bargain with a witness).

 Justice Scalia contends that this “theory of deliberate indifference would repeal the law of Monell [v. New York City Dept. of Social Servs., 436 U. S. 658 (1978)],” and creates a danger that “'failure to train’ would become a talismanic incantation producing municipal liability [i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee.” Ante, at 73-74 (some internal quotation marks omitted). The District Court’s charge, however, cautiously cabined the jury’s assessment of Connick’s deliberate indifference. See, e. g., Tr. 1100 (“Mr. Thompson must prove that more likely than not the Brady material would have been produced if the prosecutors involved in his un *102 derlying criminal cases had been properly trained, supervised or monitored regarding the production of Brady evidence.”). See also id., at 1096-1097, 1099-1100.
The deliberate indifference jury instruction in this case was based on the Second Circuit’s opinion in Walker v. New York, 974 F. 2d 293, 297-298 (1992), applying Canton to a § 1983 complaint alleging that a district attorney failed to train prosecutors about Brady. Justice Scalia’s fears should be calmed by post-Walker experience in the Second Circuit. There has been no “litigation flood or even rainfall,” Skinner v. Switzer, 562 U. S. 521, 535 (2011), in that Circuit in Walker’s wake. See Brief for National Association of Criminal Defense Lawyers as Amicus Curiae 39 (“Tellingly, in the Second Circuit, in the nearly 20 years since the court decided Walker, there have been no successful lawsuits for non-Brady constitutional violations committed by prosecutors at trial (and no reported ‘single violation’ Brady ease).” (citation omitted)); Brief for Center on the Administration of Criminal Law, New York University School of Law et al. as Amici Curiae 35-36 (Walker has prompted “no flood of §1983 liability”).

 The instruction Connick proposed resembled the charge given by the District Court. See supra, at 101. Connick’s proposed instruction read: “Before a district attorney’s failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens: (1) the plaintiff must show that Harry Connick knew ‘to a moral certainty’ that his employees will confront a given situation; (2) the plaintiff must show that the situation either presents the employee with a difficult choice ... such that training or supervision will make the choice less difficult or that there is a history of employees mishandling the situation; and (3) the plaintiff must show that the wrong ehoice by the assistant district attorney will frequently cause the deprivation of a citizen’s constitutional rights.” Record 992 (citing Canton, 489 U. S., at 390; punctuation altered). But cf. ante, at 74 (Scalia, J., concurring) (criticizing “Thompson’s theory” of deliberate indifference).
Petitioners, it is true, argued all along that “[t]o prove deliberate indifference, Thompson had to demonstrate a pattern of violations,” Brief for Appellants in No. 07-30443 (CA5), p. 41; see ante, at 74-75 (Scalia, J., concurring), but the court rejected their categorical position. Petitioners *103 did not otherwise assail the District Court’s formulation of the deliberate indifference instruction. E. g., Record 1662.

 Courts have noted the often trying nature of a prosecutor’s Brady obligation. See, e. g., State v. Whitlock, 454 So. 2d 871, 874 (La. App. 1984) (recognizing, in a case involving Brady issues in Connick’s Office, that “it is usually most difficult to determine whether or not inconsistencies or omitted information in witnesses’ statements are material to the defendant’s guilt” (quoting State v. Davenport, 399 So. 2d 201, 204 (La. 1981))).

 The jury could draw a direct, causal connection between Connick’s deliberate indifference, prosecutors’ misapprehension of Brady, and the Brady violations in Thompson’s case. See, e. g., supra, at 94 (prosecutors’ misunderstandings of Brady “were in large part responsible for the gross disregard of Brady rights Thompson experienced”); supra, at 95 (“The jury could attribute the violations of Thompson’s rights directly to prosecutors’ misapprehension of Brady.”)-, supra, at 94-95 (Williams did not believe Brady required disclosure of impeachment evidence and did not believe he had any obligation to turn over the impeaching “close-cut hair” police reports); supra, at 95 (At the time of the armed robbery trial, Williams reported that the results of the blood test on the swatch were “inconclusive.”); ibid. (“IWilliams] testified ... that the lab report was not Brady material... .”); supra, at 96 (Dubelier and Williams, the lead prosecutors in Thompson’s trials, “learned the prosecutorial craft in Conniek’s Office,” “did not recall any Brady training,” demonstrated “a woefully deficient understanding of Brady,” and received no supervision during Thompson’s trials); supra, at 98 (“Had Brady's importance been brought home to prosecutors, surely at least one of the four officers who knew of the swatch and lab report would have revealed their existence to defense counsel and the court.”); supra, at 100 (Connick did not want to hold prosecutors accountable for Brady compliance because he felt that doing so would make his job more difficult); supra, at 100 (Connick never disciplined a single prosecutor for violating Brady)-, supra, at 103 and this page (“Because prosecutors faced considerable pressure to get convictions, and were in *105 strueted to turn over what was required by state and federal law, but no more, the risk was all too real that they would err by withholding rather than revealing information favorable to the defense.” (citations and internal quotation marks omitted)). But ef. ante, at 60, n. 5 (“The dissent believes that evidence that the prosecutors allegedly ‘misapprehen[ded]’ Brady proves causation.”).
I note, furthermore, that the jury received clear instructions on the causation element, and neither Conniek nor the majority disputes the accuracy or adequacy of the instruction that, to prevail, Thompson must prove “that more likely than not the Brady material would have been produced if the prosecutors involved in his underlying criminal cases had been properly trained, supervised or monitored regarding the production of Brady evidence.” Tr. 1100.
The jury was properly instructed that “[f]or liability to attach because of a failure to train, the fault must be in the training program itself, not in any particular prosecutor.” Id., at 1098. Under that instruction, in finding Conniek liable, the jury necessarily rejected the argument— echoed by Justice Scalia — that Deegan “was the only bad guy.” Id., at 1074. See also id., at 1057; ante, at 76. If indeed Thompson had shown simply and only that Deegan deliberately withheld evidence, I would agree that there would be no basis for liability. But, as reams of evidence showed, disregard of Brady occurred, over and over again in Orleans Parish, before, during, and after Thompson’s 1985 robbery and murder trials.

 See Tulane University Law School, Curriculum, http://www.law. tulane.edu (select “Academics”; select “Curriculum”) (as visited Mar. 21, 2011, and in Clerk of Court’s case file).

 See Supreme Court of Louisiana, Committee on Bar Admissions, Compilation of Louisiana State Bar Examinations, Feb. 1980 through July 2010 (available in Clerk of Court’s case file).

 See La. State Bar Assn., Articles of Incorporation, Art. 14, § 10(A), La. Rev. Stat. Ann. § 37, ch. 4, App. (West 1974); ibid. (West 1988).

 Board of Comm’rs of Bryan Cty. v. Brown, 520 U. S. 397 (1997), reaffirmed “that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.” Id., at 409. Conducting this inquiry, the Court has acknowledged, “may not be an easy task for the factfinder.” Canton v. Harris, 489 U. S. 378, 391 (1989). Bryan County did not retreat from this Court’s conclusion in Canton that “judge and jury, doing their respective jobs, will be adequate to the task.” 489 U. S., at 391. See also Bryan Cty., 520 U. S., at 410 (absent a pattern, municipal liability may be predicated on “a particular glaring omission in a training regimen”). But cf. ante, at 68-70 (suggesting that under no set of faets could a plaintiff establish deliberate indifference for failure to train prosecutors in their Brady obligation without showing a prior pattern of violations).

 When Congress sought to render a claim for relief contingent on showing a pattern or practice, it did so expressly. See, e. g., 42 U. S. C. § 14141(a) (“It shall be unlawful for any governmental authority ... to engage in a pattern or practice of conduct by law enforcement officers ... that deprives persons of rights . .. protected by the Constitution .. ..”); 15 U. S. C. § 6104(a) (“Any person adversely affected by any pattern or practice of telemarketing... may... bring a civil action....”); 49 U. S. C. § 306(e) (authorizing the Attorney General to bring a civil action when he “has reason to believe that a person is engaged in a pattern or practice [of] violating this section”). See also 47 U. S. C. §532(e)(2)-(3) (authorizing the Federal Communications Commission to establish additional rules when “the Commission finds that the prior adjudicated violations of this section constitute a pattern or. practice of violations”).

 In the end, the majority leaves open the possibility that something other than “a pattern of violations” could also give a district attorney “specific reason” to know that additional training is necessary. See ante, at 67. Connick, by his own admission, had such a reason. See supra, at 96-98.

 For example, a prosecutor’s office could be deliberately indifferent if it had a longstanding open-file policy, abandoned that policy, but failed to provide training to show prosecutors how to comply with their Brady obligations in the altered circumstances. Or a district attorney could be deliberately indifferent if he had a practice of pairing well-trained prosecutors with untrained prosecutors, knew that such supervision had stopped untrained prosecutors from committing Brady violations, but nevertheless changed the staffing on cases so that untrained prosecutors worked without supervision.

 If the majority reads this statement as an endorsement of respondeat superior liability, ante, at 70, n. 12, then it entirely “misses [my] point,” cf. ante, at 69. Canton recognized that deliberate indifference liability and respondeat superior liability are not one and the same. 489 U. S., at 385, 388-389. Connick was directly responsible for the Brady violations in Thompson’s prosecutions not because he hired prosecutors who violated Brady, but because of his own deliberate indifference.